# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2641

_____

United States of America

*Plaintiff - Appellee*

v.

Johnelle Lewis Bell, also known as Victorious P, also known as Bam

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Council Bluffs

_____

Submitted: April 16, 2014
Filed: August 4, 2014

_____

Before SMITH, COLLOTON, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Johnelle Lewis Bell of conspiracy to commit sex trafficking, sex trafficking, coercion and enticement to travel in interstate commerce for prostitution, conspiracy to engage in interstate transportation for prostitution, and interstate transportation for prostitution, after Bell coerced several women to travel interstate to perform commercial sex acts for Bell's pecuniary gain. On appeal, Bell

challenges whether (1) sufficient evidence supported his convictions for conspiracy to commit sex trafficking, sex trafficking, and coercion and enticement to travel in interstate commerce for prostitution; (2) the district court[1] erred in denying Bell's motion for new trial based on the weight of the evidence; (3) the district court erred in denying Bell's motion for new trial based on newly discovered evidence; (4) the district court properly overruled Bell's Federal Rule of Evidence 403 objections to trial testimony regarding the victims' troubled pasts; and (5) Bell's 360-month prison sentence violates the Eighth Amendment. We affirm.

## I. *Background*

An undercover informant with the Federal Bureau of Investigation (FBI) responded to a posting on the "Backpage" website that advertised prostitution services. The informant responded to the posting by making an appointment to meet the advertisement's subject, Jennifer Olewnik, at a hotel in Omaha, Nebraska. At the appointment, he and Olewnik negotiated for the informant to pay for a massage followed by oral sex. The FBI then raided the hotel room. Bell, a self-admitted "pimp," was present during the raid along with Olewnik and another prostitute named Sabra Addison ("Sabra"). After the raid, Sabra was crying hysterically, shaking, and sitting in a fetal position.

Former prostitutes that Bell employed provided most of the government's evidence against Bell. Bell met Olewnik at a bar in Philadelphia, Pennsylvania, during the summer of 2010. Bell told Olewnik that he lived in New Jersey and that he was going through a divorce.[2] The pair quickly formed an intimate relationship. The relationship paused briefly while Olewnik was hospitalized in a psychiatric facility. While there, Olewnik informed Bell of her admission and treatment. After

---

[1]The Honorable James E. Gritzner, Chief Judge, United States District Court for the Southern District of Iowa.

[2]Bell was married throughout the course of these events.

Olewnik's discharge, she resumed her relationship with Bell. Olewnik testified that Bell then asked her if she would be interested in working for him as a prostitute. He promised her that she would never "have to work another 9:00 to 5:00 job again." Despite this "business" proposition, Bell and Olewnik maintained their intimate relationship. Bell told Olewnik that he loved her. Bell assured Olewnik that they would have a stable environment that would allow Olewnik to obtain custody of her young daughter, who was living with Olewnik's mother. Bell assured Olewnik that they would be together for a long time, that they would have children, and that "he would make sure [she] had everything that [she] wanted and needed." With these assurances, Olewnik agreed to work as a prostitute for Bell in November 2010. Bell acknowledges in his brief that "[i]n the months that followed, Olewnik traveled from state to state with Mr. Bell, along with other prostitutes and pimps, engaging in commercial sex acts and advertising mostly on the Backpage website." Olewnik estimated that she made over $50,000 for Bell by performing commercial sex acts.

Bell and Olewnik traveled to several states pursuant to their arrangement, including Pennsylvania, New Jersey, Maryland, and South Carolina. Bell determined where they traveled and, more generally, made the decisions for the pair. Bell set rules for Olewnik. For example, "Bell told [Olewnik that she] would not be allowed to talk to any other pimps because that would be disrespectful to him."

During these travels, Bell began to physically assault Olewnik. She testified that, while in transit from Maryland to South Carolina, Bell at one point "turned around and smacked [Olewnik] in the face" because she "said something smart." Leaving South Carolina, the two traveled to Little Rock, Arkansas, which was "the home base" of Bell's prostitution operation. While in Little Rock, Olewnik objected to prostituting at truck stops. Bell told Olewnik that she "ha[d] no choice." When she continued to object, "he made [Olewnik] lay down on the bed [and] pull down [her] pants[,] and [he] hit [her] with a belt." Olewnik then complied and went to the truck stop to sell sex acts because she "wasn't trying to get hit anymore."

While in Little Rock, Olewnik met a prostitute named Courtney Mayberry. Olewnik and Bell recruited Mayberry to join their enterprise rather than prostitute alone. Bell made promises to Mayberry similar to those that he had made to Olewink. He promised Mayberry "[t]hat he would always make sure that [she was] safe and taken care of and had everything [she] needed and wanted." Bell also promised Mayberry that "[w]hen everything was done, he just wanted to be with [her], all the other girls would be excluded, and that [she] wouldn't have to do [prostitution] anymore after it was all over." Mayberry agreed and began performing commercial sex acts for Bell. During this time, Bell told Mayberry that he loved her and wrote her poetry expressing his love. Bell also informed Mayberry that he was not married. Finally, Bell instructed Mayberry not to look into the eyes or speak to another pimp. Mayberry testified that she and Bell traveled to various states pursuant to their arrangement.

Mayberry and Bell developed a sexual relationship within a few days of her recruitment. After Olewnik discovered Mayberry and Bell having sex, Olewnik confronted Bell. Bell slapped Olewnik in the face, pushed her into the motel bathroom, and choked her because she threatened to call police. While choking Olewnik, Bell "told [her] if [she] ever threatened him with the cops again that he was going to kill [her] and [her] family, especially [her] daughter." Bell and Mayberry left, but Olewnik remained and performed commercial sex acts in the room for Bell. Olewnik testified that she still loved Bell at this time and wished that his promises to her would come true. After a few weeks apart from Bell, Olewnik contacted her mother to return home. But Olwenik refused her mother's conditions and decided to remain with Bell.

One month after recruiting Mayberry, Bell recruited another prostitute named Brittany Lawson. Bell and Lawson soon became intimate. Like Olewnik and Mayberry, Bell persuaded Lawson with assurances that she no longer needed "to worry about anything anymore, that [she] was going to be taken care of and he was

going to be with [her], that he wanted someone like [her]." Bell explained that he could give Lawson "children, happiness, trust, loyalty." Lawson testified that she did not realize initially that Bell recruited her to be a prostitute; rather, she thought Bell was proposing a typical relationship.

Upset with Bell over his new escapades with Lawson, Olewnik and Mayberry left Bell despite their continued affections for him. They took with them a camera and computer that Bell used to post online solicitations. Bell and Lawson searched for Olewnik and Mayberry but were unable to locate them. With two of his prostitutes gone, Bell convinced Lawson to prostitute for him. They traveled to several states pursuant to this arrangement. Bell also instructed Lawson not to make eye contact with other pimps or speak with them.

In the meantime, another prostitute named "Francesca" joined the group. She traveled to several states including Georgia, South Carolina, Alabama, and Louisiana to engage in commercial sex acts for Bell's benefit. She left with another pimp after about one month.

Approximately two months after Francesca departed, Olewnik returned to work for Bell, but Mayberry never returned.[3] During her hiatus, Olewnik stayed with Mayberry and frequently used narcotics. She performed commercial sex acts for Mayberry's benefit so that they could purchase these narcotics. Olewnik eventually left Mayberry and contacted Bell. She testified that she contacted Bell "[b]ecause [she] needed help and [she] needed to feel secure again and to feel safe, and [she] wanted to get clean from the drugs that [she] was on." She called her mother but did

_____

[3]Mayberry later attempted to return to Bell but to no avail. She sent Bell several unsolicited Facebook messages pleading for his permission to allow her return, including "[p]lease Johnelle I want to come home to stay." She never located Bell before his arrest.

not return home because she was not ready to fulfill her mother's condition of being a model parent to Olewnik's young daughter.

Bell also imposed conditions on Olewnik's return, requiring that she "had to work and that [she] had to stay off the drugs and that [she] had to be loyal and every penny that [she] got had to go to him and [she] couldn't keep anything from him." Olewnik testified that she still had feelings for Bell. She also testified that she still believed that she and Bell would "end up together," but "as long as [she] kept doing the disrespectful thing, not being loyal to him, there was no chance." Around March 2011, Olewnik returned to Bell. Olewnik, Lawson, Francesca, and Bell traveled to various states to perform commercial sex acts. While in South Carolina, Lawson and Francesca left with another pimp; however, Lawson soon returned. Thus, Olewnik, Lawson, and Bell continued to travel to various states.

Olewnik recalls an incident where, after she had returned, Bell kicked and slapped her for falling asleep rather than working. The beating resulted in a large bruise along Olewnik's ribs as well as a large bruise on her face. She testified that Bell continued to slap her in the face occasionally up until his arrest. He also continued to threaten Olewnik, stating, "If [she] ever left him, he would kill [her] and [her] family. If [she] ever snitched—if [she] ever gave him up to the cops, same thing. If [she] ever lied, if [she] ever lied to him or if [she] ever kept money from him." Olewnik explained that Bell informed her that he knew people who could carry out his threats against her, her family, and especially her daughter. Olewnik also knew that Bell carried a firearm.

Bell also required that Olewnik perform anal sex for money despite Olewnik's objection to the pain. She nonetheless complied "to make [Bell] happy" "[b]ecause as long as he was happy, [she] didn't get hit." She also explained that she told Bell that she wanted to go home, but Bell denied her request, stating that Olewnik could go home if she gave him 30 days of "hard core working." He never allowed her to

-6-

leave. Lawson characterized Bell's treatment of Olewnik as being like one would treat a "dog."

While working in Louisiana, Olewnik was arrested in a prostitution sting; however, she did not tell authorities about Bell because of his threatened retribution against her. Bell, Lawson, and Tiffany Addison ("Tiffany") bonded Olewnik out of jail, picked her up, and drove to Hot Springs, Arkansas, where Tiffany lived. While in Hot Springs, Tiffany asked her sister, Sabra, if Sabra "wanted to go hang out with her home girl and her home girl's boyfriend." Sabra agreed, and they all drove to Texarkana, Arkansas. Sabra had never met Bell before. While alone, Bell informed Sabra that he wanted her to work for him. She testified that Bell told her "[t]hat [she] couldn't go home and that if [she] talked to the police, he would hurt [her], and if [she] snitched on him, he would hurt [her] and [her] family."

Bell refused to allow Sabra to return home. A few days later while in Fayetteville, Arkansas, Bell confiscated Sabra's phone "because nobody needed to have [her] phone number except for [customers]." Bell kept Sabra's phone and allowed Sabra to use it occasionally. While traveling, Bell informed Sabra, Lawson, and Olewnik

> "that if [they] ever got caught by the police to not snitch on him because he would kill [them] and [their] families, and that if [they] ever ran to the police, he would kill [them], and that for every year . . . that he was locked up, [they] would lose somebody in [their] family."

Olewnik corroborated Bell's threats to Sabra by telling Sabra about the beatings that Bell had inflicted. Consequently, while in Iowa, Sabra performed commercial sex acts for Bell because she "would rather work for him than put [her] family in danger." Sabra had never before been a prostitute.

About a week after Sabra joined the group, the Omaha bust occurred. Sabra explained that she was very scared for the safety of her family, causing her to cry and shake violently. Despite Bell's arrest, Olewnik and Mayberry continued attempts to contact him. Olewnik, Lawson, and Mayberry eventually reunited and continued to engage in prostitution and drug use. They even performed commercial sex acts for other pimps.

A grand jury indicted Bell on a variety of charges. Bell was charged with one count of conspiracy to commit sex trafficking, in violation of 18 U.S.C. §§ 1594(c) and 1591(a). Bell was also charged with two counts of sex trafficking, in violation of 18 U.S.C. §§ 2, 1591(a)(1), 1591(a)(2), 1591(b)(1), and 1594(a), based on his treatment of Olewnik in May 2011 and Olewnik and Sabra in June 2011. Additionally, Bell was charged with four counts of coercion and enticement to travel in interstate commerce for prostitution, in violation of 18 U.S.C. §§ 2 and 2422(a). Finally, Bell was charged with five other prostitution-related charges that he does not challenge on appeal.

A jury convicted Bell on all charges. The district court sentenced Bell to 360 months' imprisonment on the conspiracy-to-commit-sex-trafficking count, 180 months' imprisonment on each of the sex-trafficking counts, and 240 months' on each of the coercion/enticement counts, all to be served concurrently. The district court denied Bell's motions for new trial.

II. *Discussion*

Bell challenges on appeal whether (1) sufficient evidence supports his convictions for conspiracy to commit sex trafficking, sex trafficking, and coercion and enticement to travel in interstate commerce for prostitution; (2) the district court erred in denying Bell's motion for new trial based on the weight of the evidence; (3) the district court erred in denying Bell's motion for new trial based on newly discovered evidence; (4) the district court properly overruled Bell's Federal Rule of

Evidence 403 objections to trial testimony regarding the victims' troubled pasts; and (5) Bell's 360-month prison sentence violates the Eighth Amendment.

## A. *Sufficiency of the Evidence*

"We review de novo the sufficiency of the evidence to sustain a conviction, viewing the evidence in a light most favorable to the verdict and accepting all reasonable inferences supporting the verdict." *United States v. Colton*, 742 F.3d 345, 348 (8th Cir. 2014) (per curiam) (citation omitted). Furthermore, "[w]e will overturn [Bell's] conviction only if no reasonable jury could have found him guilty beyond a reasonable doubt." *Id.* (quotation and citation omitted). The standard of review for sufficiency-of-the-evidence challenges is strict. *Id.* "[W]e consider the same quantum of evidence that was presented at trial, even if some of the evidence was improperly admitted." *United States v. White Bull*, 646 F.3d 1082, 1087 (8th Cir. 2011) (quotation and citation omitted). Finally, "a victim's testimony alone can be sufficient to prove" the sex crime in question. *Id.* (quotation and citation omitted).

## 1. *Conspiracy to Commit Sex Trafficking and Sex Trafficking*

Bell challenges the sufficiency of the evidence supporting his conviction for conspiracy to commit sex trafficking and sex trafficking. Bell asserts that the government did not prove that he knew or recklessly disregarded that force, threats of force, fraud, and coercion would be used to cause the victims to commit commercial sex acts.

Federal law provides that "[w]hoever conspires with another to violate [18 U.S.C. §] 1591 shall be fined under this title, imprisoned for any term of years or for life, or both." 18 U.S.C. § 1594(c). Furthermore, § 1591 provides in relevant part:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

*knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act* . . . shall be punished . . . .

18 U.S.C. § 1591(a) (emphasis added). "Coercion" is further defined as "threats of serious harm to or physical restraint against any person," "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person," or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2)(A)–(C). Finally, "serious harm" is defined as

any harm, *whether physical or nonphysical, including psychological*, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel *a reasonable person of the same background and in the same circumstances* to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

18 U.S.C. § 1591(e)(4) (emphases added).

Bell contends that "[t]he women who worked with [him] did not do so as a result of 'force, threats of force, fraud, coercion,' or any combination of such means." Bell emphasizes that each of the victims, except Sabra, were prostitutes before

-10-

meeting Bell.[4] He thus implies that he could not be responsible for making these women perform commercial sex acts by force because they were already doing them of their own volition.

Bell avers that the evidence showed that he never threatened any of these women to begin working for him; rather, they each agreed after he courted them. Bell also contends that the women were not threatened, forced, or coerced into continuing their services for Bell because they often left Bell and pleaded that he accept their return. In fact, two women—Mayberry and Francesca—left Bell and never returned. Also, Bell contends that the girls could have easily escaped if they truly felt endangered. For example, on the day of the FBI sting, Olewnik, Sabra, and Lawson traveled to a shopping mall without Bell. However, as the government correctly points out, Olewnik and Sabra were under threat of familial death if they attempted escape, and they each knew that Lawson might inform Bell because she was more allied with Bell than with the other girls.

Finally, Bell notes that each woman, except Sabra, continued to perform commercial sex acts after separating from Bell. Thus, Bell argues that they joined him willingly rather than from coercion or threats.

Section 1591(a) defines "sex trafficking" in the disjunctive, so the government had to prove only that Bell knew or recklessly disregarded that force, threats of force, fraud, *or* coercion would be used on these women. In fact, the government proved that Bell himself used force, threats of force, fraud, and coercion to force these women to perform commercial sex acts against their will. Olewnik testified to several incidents where Bell physically assaulted her when she allegedly disobeyed or

---

[4]Olewnik testified at trial that she had never been a prostitute before meeting Bell; however, Olewnik informed an investigating officer that she had previously performed oral sex for money.

disrespected him. The physical harm was enough to cause her to perform sex acts against her will. For example, Bell's prior physical assaults scared Olewnik such that she felt obligated to perform anal sex and commercial sex services at truck stops because she did not want Bell to assault her. Bell also levied threats against the women by claiming that he would harm them or their families. He even threatened the women's young children.

Bell also procured their services through deception. He consistently misrepresented his marital status. More significantly, Bell adopted a pattern of convincing these women that he loved them and would take care of them at the exclusion of all others. He convinced them that they would be financially secure, emotionally secure, and loved. In short, Bell preyed upon vulnerable women.

Finally, Bell coerced these women into performing commercial sex acts. He threatened both their physical and psychological well-being should they leave or implicate him to police. A reasonable person in this situation likely would have found his threats of harm credible, especially when Bell physically assaulted Olewnik, carried a weapon, and knew other pimps who could carry out his threats.

In his briefs, Bell seems to argue that the government had to prove that Bell physically abused the victims. He focuses on Jury Instruction 20, which the district court provided the jury at the government's suggestion. Jury Instruction 20 defined "force" as "any form of power, violence, or physical pressure directed against another person." Bell contends that this definition of "force" required the government to prove physical violence against the victims, which Bell argues that the government failed to prove. Bell avers that Jury Instruction 20 became the law of the case. *See United States v. Staples*, 435 F.3d 860, 866 (8th Cir. 2006) ("Where the instructions to the jury include elements that are not dictated by statute, the instructions nonetheless become the law of the case." (citations omitted)).

-12-

We reject Bell's argument for three reasons. First, the evidence demonstrated that Bell did physically assault at least one of the victims in question—Olewnik. Olewnik testified that Bell assaulted her several times. Second, at least three women testified that Olewnik threatened to use force against them or their families, which § 1591 explicitly contemplates and which Jury Instruction 20 does not exclude. Third, immediately after defining "force," the district court defined "power" as "dominance, control or influence." This definition of "power" is not limited to physical abuse only. The district court also provided an instruction that defined "fraud" as "any deliberate act of deception, trickery or misrepresentation." It also provided an instruction that defined "coercion" and "serious harm" like 18 U.S.C. § 1591(e). The statutory definition of "serious harm" explicitly includes physical and non-physical types of harm. *See* 18 U.S.C. § 1591(e)(4). Consequently, Bell interprets the jury instructions too narrowly. Thus, Jury Instruction 20 did not require the government to prove that Bell physically assaulted the victims; however, even if it did, the government still proved actual and threatened physical harm. *See White Bull*, 646 F.3d at 1087–88 (victim's testimony alone, even if somewhat inconsistent, can be sufficient evidence to convict).

Bell also emphasizes that the victims here, except Sabra, were prostitutes previously and continued to be prostitutes after Bell's arrest. However, the evidence shows that, at least by the spring of 2011, these women did not want to be *his* prostitutes. Bell threatened Olewnik and Sabra that he would murder them or their families should they leave or implicate him to police. The prostitution histories of these women do not preclude a finding that Bell violated § 1591. *See United States v. Chang Da Liu*, 538 F.3d 1078, 1085–86 (9th Cir. 2008).

Finally, even if we accepted the notion that prostitutes joined and departed of their own volition, the evidence at trial suggested otherwise as it related to Sabra. Sabra's unrefuted testimony demonstrated that Bell forced her to act as a prostitute for his pecuniary gain. He threatened to harm her and her two-year-old child. He

-13-

confiscated her cell phone to isolate her from friends and family. FBI agents described Sabra as weeping, shaking, and curled into a fetal position after the Omaha raid, corroborating Sabra's testimony that she feared for her and her child's safety should law enforcement catch Bell.

The facts show that Bell intimidated these women to commit specific commercial sex acts. Bell physically assaulted at least one of the prostitutes, threatened the physical well-being of several others and their families, made false promises and statements to induce their compliance, and coerced them into committing these acts for his profit. Thus, we reject Bell's sufficiency argument as it relates to the conspiracy and sex-trafficking charges.

## 2. *Coercion and Enticement*

The coercion and enticement statute under which the jury convicted Bell provides that

> [w]hoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 2422(a). The district court instructed the jury that "induce" meant "'to lead on to some action, prevail on'—as to provide 'motive or incentive.'" It defined "entice" as "to attract by offering hope of reward or pleasure." It defined "persuade" as "to cause to do something, especially by reasoning or urging, to convince." Finally, it defined "coerce" as "to achieve by force or threats."

The jury had sufficient evidence to conclude that Bell coerced or enticed these women to become his prostitutes. *See* Part II.A.1., *supra*. Bell "enticed" these

-14-

vulnerable victims by promising them bright futures consisting of money, children, security, and stability. He also "coerced" them by obtaining their services through force or threats.

We also hold that Bell failed to discuss adequately his challenge to the § 2422(a) convictions in his brief, focusing instead on his § 1591 challenge. He therefore waived his sufficiency challenge to these convictions. *See United States v. Chaika*, 695 F.3d 741, 746 (8th Cir. 2012) (noting that a defendant who merely "maintains his objections" without argument fails to preserve the issue). Consequently, we reject Bell's sufficiency argument because the evidence supported the jury's finding that he enticed and coerced his victims to become his prostitutes and because he failed to preserve his argument to the contrary.

B. *Motion for New Trial Based on Weight of the Evidence*

Bell contends that the district court erred by failing to grant his motion for new trial because the weight of the evidence favored him. We have explained that

> [t]he decision to grant or deny a motion for a new trial based upon the weight of the evidence is within the sound discretion of the trial court. While the district court's discretion is quite broad—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict—there are limits to it. Unless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand.

*United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quotation and citations omitted).

Federal Rule of Criminal Procedure 33(a) provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Motions for new trials based on the weight of the evidence are generally disfavored." *Campos*,

306 F.3d at 579. The district court has broad discretion in resolving these motions, but it must exercise its Rule 33 powers "sparingly and with caution." *Id.* (quotation and citations omitted). The district court may grant the motion even where substantial evidence supports the verdict. *United States v. Dodd*, 391 F.3d 930, 934 (8th Cir. 2004).

The district court did not abuse its discretion in denying Bell's motion for new trial based on the weight of the evidence. *See* Part II.A.1., *supra*. Although the evidence revealed that, at certain times, the prostitutes may have remained with Bell on their own accord, the evidence still weighed heavily against Bell. For example, as the operation progressed, Bell assaulted at least one prostitute, threatened several others with death or death of loved ones, lied, and coerced these vulnerable women into becoming or remaining prostitutes for his financial gain. In order to avoid beatings or harm to their families, these women performed certain commercial sex acts against their will, even if they freely opted to perform other services for Bell. On this record, the district court did not abuse its discretion in refusing to grant Bell's motion for new trial based on the weight of the evidence.

C. *Motion for New Trial Based on Newly Discovered Evidence*

Bell contends that the district court erred by denying his motion for new trial based on newly discovered evidence. Apparently, Bell located Tiffany, who did not testify, after trial. In his motion for new trial, Bell alleges that, if called upon, Tiffany would have testified at trial that

> in June, 2011 she and her sister, Sabra Addison, were invited to Texarkana for a weekend of partying with Tiffany's friend, Brittany Lawson, and persons with whom Lawson was associated . . . . Sabra was aware before meeting up with them that they were involved in a prostitution operation. They were picked up and taken to a hotel, in which Sabra went into another room with Brittany Lawson and Jennifer Olewnik. They explained to her the nature of the operation. Tiffany

-16-

Addison was pregnant at that time and was not involved in prostitution. The others, including Sabra, went out on calls. Sabra asked Tiffany to do her makeup and hair before she went, so that she looked her best. During this time, Sabra attempted to find a babysitter for her daughter so she could go out with the other girls on calls.

Bell avers that this testimony would have contradicted Sabra's testimony that Bell forced Sabra into prostitution. Bell contends that Tiffany's testimony would likely have changed the outcome of the trial.

"We review for clear abuse of discretion the district court's denial of [defendant's] motion for a new trial based on newly discovered evidence." *United States v. Herbst*, 666 F.3d 504, 512 (8th Cir. 2012) (citation omitted). To obtain a new trial on the basis of newly discovered evidence, we require the moving party to demonstrate that

> (1) the evidence is in fact newly discovered since trial; (2) diligence on his part; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) it is probable that the new evidence would produce an acquittal at the new trial.

*United States v. Myers*, 503 F.3d 676, 682–83 (8th Cir. 2007) (citation omitted). The district court determined that Bell satisfied only element (4) and thus denied the motion.[5]

"The test for newly discovered evidence is whether the evidence could have been discovered earlier in the exercise of due diligence." *Meadows v. Delo*, 99 F.3d 280, 282 (8th Cir. 1996) (quotation and citation omitted). Even where an affidavit is not available until after trial, if the factual basis for the testimony in the affidavit

---

[5]The government conceded element (4).

existed before trial, then it is not newly discovered evidence. *Id.* In other words, "Rule 33 does not authorize district courts to grant new trials on the basis of such evidence since it is not newly discovered, but merely newly available." *United States v. Owen*, 500 F.3d 83, 89 (2d Cir. 2007). We have recognized that a witness's failure to appear before trial to exculpate a defendant, especially where the moving party knows about the involvement of that witness, does not constitute newly discovered evidence. *See United States v. Rogers*, 982 F.2d 1241, 1245 (8th Cir. 1993).

As for the moving party's exercise of diligence, the moving party must explain why the evidence was not discovered before trial. *Myers*, 503 F.3d at 683. In other words, the moving party must "allege facts from which the court may infer diligence on the part of the movant." *United States v. Mosby*, 12 F.3d 137, 138 (8th Cir. 1993) (per curiam) (quotation and citations omitted). We have previously rejected the unavailable-witness argument when the moving party knew of that witness's importance, failed to obtain the witness's testimony earlier, and failed to provide an explanation as to why the moving party did not locate the witness before trial. *See United States v. Moore*, 221 F.3d 1056, 1058 (8th Cir. 2000). Inaction in locating a witness does not constitute diligence. *United States v. Lee*, 312 F. App'x 844, 846 (8th Cir. 2009) (per curiam).

Here, the district court correctly concluded that the factual basis for Tiffany's testimony existed before trial, so it constituted newly available evidence rather than newly discovered evidence. *See Owen*, 500 F.3d at 89. Furthermore, Bell never articulated facts that demonstrated that he was diligent in locating Tiffany. *See Mosby*, 12 F.3d at 138. Bell's inaction in locating Tiffany reflects dalliance more than diligence. *See Lee*, 312 F. App'x at 846. The district court did not abuse its discretion in denying Bell's motion for new trial based on newly discovered evidence.

## D. *Rule 403*

Bell contends that the district court allowed the government to introduce too many details regarding the personal lives of the victims, in violation of Federal Rule of Evidence 403. Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "We accord great deference to the District Court's application of the Rule 403 balancing test, and we will reverse only if the Court committed a clear abuse of discretion." *United States v. Condon*, 720 F.3d 748, 755 (8th Cir. 2013) (quotation, alteration, and citation omitted). We will not substitute our judgment for the judgment of the district court unless the district court abused its discretion. *Id.*

Under Rule 403, unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (quotation and citation omitted). Furthermore, "[e]vidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning." *Id.* (quotation and citation omitted). District courts have "a great deal of discretion" in determining whether evidence is misleading. *Id.* (quotation and citation omitted).

At trial, the government asked the victims about their troubled childhoods. For example, Olewnik testified over Bell's objection that she had a long psychiatric history that began when she was in third grade. She dropped out of school by ninth grade. She had a history of substance abuse involving crack, cocaine, marijuana, and alcohol. A 2011 psychiatric exam noted that her ex-boyfriend/pimp had physically, emotionally, and mentally abused her.

Mayberry testified that she was separated from her parents by age two and placed with her grandparents. Her grandparents mentally, physically, and verbally

abused her. She was raped. She attempted suicide at 14 and was hospitalized as a result. She began abusing marijuana and cocaine by 14. She ran away from foster care at 16 and began living on the streets and prostituting.

The government also called Olewnik's mother at trial to testify about Olewnik's troubled past. She testified as to her divorce from Olewnik's father as well as the father's physical abuse. She explained that Olewnik had anger issues toward her father. She also discussed how Olewnik searched for a paternal figure, which Olewnik's mother thought helped explain Olewnik's attraction to Bell.

Bell contends that the district court erred in overruling his objections to this evidence. We disagree. Victim vulnerability is relevant to whether a victim was coerced. *See United States v. Kozminski*, 487 U.S. 931, 952 (1998). In *Kozminski*, the Supreme Court defined "involuntary servitude" as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Id.*[6] The *Kozminski* Court explicitly stated that "the vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve." *Id.*; *see also* 18 U.S.C. § 1591(e)(4) (defining "serious harm" as any harm "that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person *of the same*

_____

[6]There is some discussion in the briefs regarding how the Trafficking Victims Protection Act (TVPA), under which Bell was convicted, was a Congressional overrule of *Kozminski*. In fact, in its findings to the TVPA, Congress expressly noted that the *Kozminski* court interpreted "involuntary servitude" too narrowly so that "only servitude that is brought about through use or threatened use of physical or legal coercion" was punishable. 22 U.S.C. § 7101(b)(13). Thus, although Congress overruled *Kozminski*, it did so because it believed that the *Kozminski* Court was not protective enough of sex-trafficking victims. Thus, any protections that *Kozminski* gave victims should still apply.

-20-

*background and in the same circumstances* to perform or to continue performing commercial sexual activity in order to avoid incurring that harm" (emphasis added)).

The issue becomes how much of a victim's personal life and special vulnerabilities it takes to establish the point before it becomes unfairly prejudicial to the defendant. Bell argues that the government should not be able to introduce every detail about a victim's personal life, especially details unknown to the defendant. The basis of the victim's vulnerability in *Kozminski* was more apparent than here, for the *Kozminski* victims were two mentally retarded men. *Id.* at 934. Mental handicap is probably much more apparent than a victim's troubled past such that additional testimony may not be as helpful to the jury. Thus, the *Kozminski* Court did not address the amount of victim-vulnerability evidence that a district court may allow.

We nonetheless conclude that the district court did not err here. First, we accord district courts great deference in making Rule 403 determinations. *Condon*, 720 F.3d at 755. Second, in weighing the Rule 403 considerations, the evidence possessed probative value. Olewnik's and Mayberry's motivations for joining or remaining with Bell were important, particularly in determining whether the women were free to leave or whether it was objectively reasonable for them to rely on Bell's promises. Third, at least one court has upheld introduction of vulnerable-victim testimony in a sex-trafficking case when the testimony helped explain why a victim continued to succumb to the defendant's persuasion. *See United States v. Alzanki*, 54 F.3d 994, 1005 n.10 (1st Cir. 1995) ("Though such a prospect might not have seemed credible to a competent adult American, the 'special vulnerabilities' of the victim must be taken into consideration." (citation omitted)). Bell has not shown that either of these women's background evidence was unfairly prejudicial. The evidence did not attempt to blame Bell for their lamentable developmental years but rather to establish how those years might have made them more susceptible to his or anyone's coercive methods.

## E. *Eighth Amendment*

Bell argues that his 360-month sentence violates the Eighth Amendment because of the "Congressional findings in 22 U.S.C. § 7101 that the draconian maximum penalty for the offense applies to something more elaborate than Johnelle Bell moving from city to city with a handful of prostitutes." Bell contends that a 360-month sentence is more appropriate for sex trafficking rings that cross international borders. The district court rejected Bell's argument with little discussion.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. We have "adopted Justice Kennedy's analysis in *Harmelin*[7] to determine whether a sentence is 'grossly disproportionate' to a crime and thus violates the Eighth Amendment." *United States v. Wiest*, 596 F.3d 906, 911 (8th Cir. 2010) (citation omitted). The principle derived from *Harmelin* is "that the Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* (quotation and citation omitted). "It is exceedingly rare for an offense that does not have a capital sentence to violate the Eighth Amendment." *Id.* (citation omitted).

In comparing the sentence to sentences of related crimes, we have noted that "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed to the sentence imposed leads to an inference of gross disproportionality." *Id.* (quotation, alteration, and citation omitted). At this threshold stage, we look to the "gravity of the crime, considering the harm caused or threatened to the victim or to society, and the culpability and degree of the defendant's involvement." *Id.* at 911–12 (citation omitted).

---

[7]*Harmelin v. Michigan*, 501 U.S. 957 (1991).

To support his argument, Bell attempts to compare his conviction to a conviction for pandering under Iowa law, which carries a maximum five year sentence. *See* Iowa Code §§ 725.3 (offense of pandering) and 902.9(1)(e) (five-year maximum). Alternatively, he asks the court to compare his conviction to assault that causes bodily injury under Iowa law, which carries a one-year maximum sentence. *See* Iowa Code §§ 708.1(assault defined); 708.2 (assault classifications); 903.1(1)(b) (one-year maximum).

However, as *Wiest* makes clear, Bell cannot make these "interjurisdictional" comparisons at the threshold stage. *See Wiest*, 596 F.3d at 911. At this stage, we consider the gravity of the crime and the defendant's role in it. The gravity of Bell's crime was substantial. Bell convinced these women to prostitute themselves, and when they desired to stop, Bell forced them to continue by assaulting them or threatening to harm them and their families. He was not merely "a pimp who travel[ed] across the Missouri River with three prostitutes." The evidence showed otherwise. His associates were not always willing partners. The evidence showed that Bell organized the illicit enterprise, directing the victims where they would travel and where and when they would merchandise themselves. He also controlled the revenue and required them to perform sexual acts despite their objections. The conduct for which Bell was convicted is heinous. Considering the crime's characteristics and the potential risks to his victims, his 360-month sentence is not "grossly disproportionate" as a threshold matter. We therefore reject Bell's comparisons to Iowa's pandering or assault statutes.

In further support of his argument that 360-month sentences for violations of the TVPA apply only to international traffickers, Bell emphasizes some of Congress's express findings in adopting the TVPA. For example, Bell acknowledges the finding that "[a]t least 700,000 persons annually, primarily women and children, are trafficked within or across international borders. Approximately 50,000 women and children are trafficked into the United States each year." 22 U.S.C. § 7101(b)(1). He

also emphasizes that "[t]he low status of women in many parts of the world has contributed to a burgeoning of the trafficking industry." 22 U.S.C. § 7101(b)(2). Bell also acknowledges Congress's characterization of sex trafficking as a "transnational crime." 22 U.S.C. § 7101(b)(3).

However, several other findings indicate that Congress intended the TVPA to apply to defendants like Bell. First and foremost, § 1591 applies to sex trafficking "in or affecting *interstate* or foreign commerce." 18 U.S.C. § 1591(a)(1) (emphasis added). Additionally, one finding provides that

> [t]raffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin. Traffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models. Traffickers also buy children from poor families and sell them into prostitution or into various types of forced or bonded labor.

22 U.S.C. § 7101(b)(4). This is precisely how Bell lured the victims here. Notably, 22 U.S.C. § 7101(b)(5) expressly contemplates that the offense can be committed within a single country as it finds that "[t]raffickers often transport victims from their home communities to unfamiliar destinations, *including* foreign countries." (Emphasis added.) Congress also found that "[v]ictims are often forced through physical violence to engage in sex acts or perform slavery-like labor. Such force includes rape and other forms of *sexual abuse*, torture, starvation, imprisonment, *threats*, *psychological abuse*, and *coercion*." 22 U.S.C. § 7101(b)(6) (emphases added). Another finding provides that "[t]raffickers often make representations to their victims that physical harm may occur to them or others should the victim escape or attempt to escape. Such representations can have the same coercive effects on

victims as direct threats to inflict such harm." 22 U.S.C. § 7101(b)(7). This is precisely what Bell did to these victims. Congress also found that the penalties for sex traffickers were too weak, acknowledging that "[i]n the United States, the seriousness of this crime and its components is not reflected in current sentencing guidelines, resulting in weak penalties for convicted traffickers." 22 U.S.C. § 7101(b)(15). Bell's cherry-picked congressional findings are unavailing. Thus, we reject Bell's Eighth Amendment claim.

### III. *Conclusion*
We therefore affirm the judgment of the district court.

———————————————