**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**February 9, 2015**

# In the Court of Appeals of Georgia

A14A1523. LEMERY v. THE STATE.                    JE-054C

ELLINGTON, Presiding Judge.

A Douglas County jury found Steven Lemery guilty of six counts of trafficking young males for sexual servitude, OCGA § 16-5-46 (c); one count of pandering by compulsion, OCGA § 16-6-14; three counts of aggravated child molestation, OCGA § 16-6-4 (c); and one count of enticing a child for indecent purposes, OCGA § 16-6-5 (a). Lemery contends that the evidence was insufficient to support his convictions for trafficking an adult victim. He also argues that his trial attorney was ineffective and that the trial court erred in failing to order, sua sponte, a competency hearing and in denying appellate counsel's post-conviction request for funds for an independent forensic psychiatric evaluation. Finding no reversible error, we affirm.

1. Lemery contends that the evidence was insufficient to support his convictions for trafficking one of his three victims, R. M.[1] He argues that he did not subject R. M., his adult boyfriend, to sexual servitude; rather, he contends that the evidence shows that R. M. willingly prostituted himself in order "maintain" him, and that Lemery "was the 'kept' one in the relationship."

Under Georgia law, a person commits the offense of human trafficking for sexual servitude when he or she "knowingly subjects another person to or maintains another person in sexual servitude or knowingly recruits, entices, harbors, transports, provides, or obtains by any means another person for the purpose of sexual servitude." OCGA § 16-5-46 (c). Sexual servitude is defined, in relevant part, as

> (A) Any sexually explicit conduct or performance involving sexually explicit conduct[2] for which anything of value is directly or indirectly given, promised to, or received by any person, which conduct is induced or obtained by coercion or deception . . . ; or

---

[1] The State indicted Lemery for trafficking in three counts for the separate acts of knowingly maintaining, knowingly harboring, and knowingly transporting R. M. for the purpose of sexual servitude. The jury convicted Lemery of all three counts.

[2] "'Sexually explicit conduct' shall have the same meaning as set forth in Code Section 16-12-100." OCGA § 16-5-46 (a) (5). The acts at issue in this case – acts of masturbation and oral and anal sexual intercourse – are included within the definition of sexually explicit conduct. See OCGA § 16-12-100 (4).

2

(B) Any sexually explicit conduct or performance involving sexually explicit conduct which is performed or provided by any person, which conduct is induced or obtained by coercion or deception[.]

OCGA § 16-5-46 (a) (6). The law specifically provides that the "age of consent for sexual activity . . . of the person being trafficked shall not constitute a defense in a prosecution for a violation of this Code section." OCGA § 16-5-46 (d).

In determining whether R. M. was subjected to sexual servitude, the jury was authorized to consider whether R. M. was deceived or coerced into participating in sexually explicit conduct. OCGA § 16-5-46 (a) (6). "Deception" includes "[c]reating or confirming another's impression of an existing fact or past event which is false and which the accused knows or believes to be false[.]" OCGA § 16-5-46 (a) (2) (A). "Coercion" in this context is not limited to actual or threatened physical or legal restraint that overmasters the will of the victim.[3] Rather, OCGA § 16-5-46 (a) (1)

---

[3] See *United States v. Kozminski*, 487 U.S. 931, 944 (II) (A) (1988), superseded by statute, Trafficking Victims Protection Act of 2000 ("TVPA") (Pub. L. 106-386, 114 Stat. 1466 (codified as amended in scattered sections of Titles 8, 18, 22 U. S. C.) ("[O]ur precedents clearly define a Thirteenth Amendment prohibition of involuntary servitude enforced by the use or threatened use of physical or legal coercion. The guarantee of freedom from involuntary servitude has never been interpreted specifically to prohibit compulsion of labor by other means, such as psychological coercion.").

3

defines "coercion" broadly to include a wide range of nonphysical harms, including those that are psychological, reputational, and financial:

> Coercion means: (A) Causing or threatening to cause bodily harm to any person, physically restraining or confining any person, or threatening to physically restrain or confine any person; (B) Exposing or threatening to expose any fact or information or disseminating or threatening to disseminate any fact or information that would tend to subject a person to criminal or immigration proceedings, hatred, contempt, or ridicule; (C) Destroying, concealing, removing, confiscating, or possessing any actual or purported passport or other immigration document, or any other actual or purported government identification document, of any person; (D) Providing a controlled substance, as such term is defined by Code Section 16-13-21, to such person for the purpose of compelling such person to engage in labor or sexual servitude against his or her will; or (E) Causing or threatening to cause financial harm to any person or using financial control over any person.

OCGA § 16-5-46 (a) (1).

The indictment in this case concerned Lemery's conduct toward three young victims, all of whom lived with Lemery. Viewed in the light most favorable to the jury's verdict,[4] the record shows that, during the periods alleged in the indictment,

---

[4] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

4

Lemery invited three young males to live with him, one of whom was R. M. Two were minors; R. M. had just turned 18. All three were from broken families, and they had little education and no financial resources. Two were from towns outside of Georgia; R. M. was from South Carolina. Lemery befriended them through text messages or through social media, he misrepresented his age, he invited them to his Douglas County home, and then he traveled to pick them up when they accepted. He provided them with food, gifts, and shelter, and he plied them all with drugs and alcohol. He made promises of love and affection to R. M. and another victim. Lemery engaged his victims in various sexual acts. Through emotional and financial manipulation, Lemery persuaded R. M. and another victim to engage in acts of prostitution and to give him their earnings. In addition to the testimony of each of the victims, the State introduced evidence of texts, emails, and photographs retrieved from Lemery's computer as well as telephone records, Internet service provider records, social media records, and records of Internet classified advertisements for sexual services – all of which corroborated the victims' testimony.

With respect to R. M., the State presented the following. Witnesses described R. M. as petite, demure, soft-spoken, immature, and fearful. He had a troubled home life. When Lemery found R. M. through social media, R. M. had just been kicked out

5

of his grandmother's house, he had few friends, and he had nowhere to stay. He had no car, no driver's license, no money, and he had dropped out of high school. R. M. perceived Lemery as his only option, so he left South Carolina when Lemery came to pick him up. R. M. testified that he was only supposed to stay a week, but that he and Lemery began dating, that their relationship became sexual, and that he moved into the master bedroom with Lemery.

While living with Lemery, R. M. abandoned his name and assumed the identity "Ryan Breezy." Lemery told R. M that he loved him, and R. M. testified that he believed he was in love with Lemery. R. M. assumed that they were in a monogamous sexual relationship and were a happy couple. R. M. was completely dependant on Lemery for food and shelter. Lemery took R. M. shopping and to clubs and restaurants. Lemery also gave R. M. alcohol and drugs, and R. M. testified that, while he was staying with Lemery, he felt "hypnotized, brainwashed." Lemery had frequent parties, and a witness testified that Lemery had cocaine, marijuana, and methamphetamine in the house and that he "bought [alcohol] by the armfuls and just passed it out to whoever was there."

A few months into their relationship, Lemery grew bored with R. M. and persuaded him to have an "open relationship" and to engage in "threesomes" with

6

strangers. R. M. was reluctant and very upset, but he felt that he had to please Lemery because he had no money and nowhere else to go and because Lemery would not take him home. As his relationship with Lemery deteriorated, Lemery became more controlling. Lemery would not let R. M. have friends or leave the house without him. R. M. testified that "[he] felt like [he] had to be on something at all times" or he "would go crazy." He begged Lemery for more drugs, and Lemery provided them.

A few months into the relationship, Lemery told R. M. that he needed to "pull his weight" financially, and he pressured R. M. to prostitute himself to earn money if he expected to stay with him. Lemery also lied to R. M., telling him that he needed money for bail and that as soon as he resolved his legal troubles, R. M. could quit prostituting himself. R. M. did not want to participate, but he was afraid that if he failed to do as Lemery asked, Lemery would go to jail and that he would lose his home. Lemery posted sexual solicitation ads on the Internet for R. M., he drove R. M. to meet clients, he waited in the car while R. M. had sex with clients, and he took R. M.'s earnings when he returned to the car. R. M. tried to get out of prostituting himself by telling Lemery that one of the clients had raped him, but the ruse failed. R. M. testified that he felt trapped and was he afraid to call his mother for help. He

was embarrassed that she would find out about what he had been doing, and he had nowhere else to go.

The State offered into evidence the corroborating eyewitness testimony of other individuals who were living in Lemery's home as tenants during the relevant period, including the testimony of Lemery's drug-addicted wife, her live-in boyfriend, and S. P., a young man who, along with two of his roommates, worked from Lemery's home as prostitutes. S. P. testified that he serviced 40 to 50 clients a week and that a portion of his earnings went to Lemery for rent. He said that Lemery knew what he and his roommates were doing, but that Lemery did not care. S. P. testified that Lemery, who was unemployed and living off of his military service benefits, got the idea from them to make money by prostituting himself and by pimping out his boyfriends through Internet classified ads.

S. P. also testified that he met R. M., and that he may have met other victims, but that "all of the names [of Lemery's boyfriends] kind of blend together." S. P. testified that R. M. was very upset by the change in his relationship with Lemery and that he wanted to leave, but that he felt trapped there by his circumstances, including the fact that he "had a drug habit to fund." Over time, he eventually became resigned to his situation: "[A]fter awhile, you just get kind of used to it." Shortly after

8

Lemery's criminal activities had been discovered by investigators, Lemery took R. M. and an underage victim to a shopping mall and abandoned them there.

Finally, the State presented the testimony of an expert witness who explained that those who traffic in sex slaves often choose their victims from society's "throw-away kids" – children from broken homes, runaways, those who feel let down by society, outcasts, the emotionally traumatized, and those in financial distress. These young people often bond with their abusers, whom they perceive as loving protectors who accept them for who they are. The expert testified that a trafficker can control his victims through psychological and financial manipulation. With sex slaves, a trafficker often seduces his victims with promises of love, attention, gifts, and then uses alcohol and drug addiction to keep them compliant. He introduces them to various sex acts until they are "sexually broken down" to the point where they are prepared to prostitute themselves. By this point, the trafficker has little concern that his victims will leave because they are either completely enthralled or resigned to their situation. Although R. M. was legally an adult when he met Lemery, the expert testified that even adults are vulnerable to this kind of manipulation and control.

This record contained evidence from which the jury could infer that Lemery kept R. M. in a state of financial dependence, using the threat of homelessness to

control him. The jury could infer that Lemery provided R. M. with drugs and alcohol and used R. M.'s addiction as a tool to keep him compliant. The jury could also infer that, when Lemery told R. M. he might go to jail unless R. M. prostituted himself to make the money that he needed to maintain their home, Lemery used deception to manipulate R. M. Given this evidence, the jury was authorized to infer that Lemery used coercion and deception, as defined in OCGA § 16-5-46 (a), in an effort to overmaster R. M.'s will and to compel him to engage in sexually explicit conduct, in violation of OCGA § 16-5-46 (c). Moreover, whether Lemery's actions were sufficient to compel a reasonable person in R. M.'s position to perform or to continue performing the alleged acts of sexual servitude was a question of fact for the jury to consider under the totality of the circumstances.[5] In this case, the evidence authorized

---

[5] OCGA § 16-5-46 does not expressly state the standard by which the jury should evaluate the behavior of the trafficker and of the victim. That the statute provides that coercion may be the result of certain threatened psychological, financial, or reputation harms implies, however, that the jury should evaluate all of the circumstances surrounding the alleged acts of trafficking, including the victim's vulnerabilities and any inequalities of power between the victim and the trafficker in determining whether the victim was coerced. See, e.g., *United States v. Nyuon*, 587 Fed. Appx. 346 (8th Cir. 2014) (a victim's family circumstances and history of abuse were relevant to her decision to remain with the defendant and to whether her conduct was coerced); *United States v. Bell*, 761 F3d 900, 913-914 (8th Cir. 2014) ("Victim vulnerability is relevant to whether a victim was coerced.") (citation omitted). See also 18 U.S.C. § 1591 (e) (4) (defining a threatened "serious harm" under the TVPA as any harm "that is sufficiently serious, under all the surrounding circumstances, to

10

the jury to find that R. M., though legally an adult, was uniquely vulnerable to Lemery's coercive scheme to transform him from a boyfriend into a prostitute. As the State's expert witness testified, R.M. was one of society's "throw-away kids" – fearful and emotionally immature, alienated from society, and lacking in the power and resources needed to extricate himself from Lemery's grasp. The evidence adduced supports Lemery's trafficking convictions with respect to R. M. beyond a reasonable doubt.

2. As discussed more fully below, Lemery presents three claims of error pertaining to his mental competency. The facts relevant to these claims of error are as follows. On September 28, 2011, almost a year prior to trial, Lemery's trial counsel filed a motion requesting an order for a psychological examination of her client, which the trial court granted the following day. Months later, the court also appointed Lemery a guardian ad litem to assist him with the "bureaucratic red tape" of obtaining his medical records from the Veterans Administration. On July 30, 2012, the trial court held a conference to address the status of the evaluation. The forensic

compel a reasonable person *of the same background and in the same circumstances* to perform or to continue performing commercial sexual activity in order to avoid incurring that harm") (emphasis supplied). See, generally, Kathleen Kim, "The Coercion of Trafficked Workers," 96 Iowa L. Rev 409 (2011) (discussing the various legal, philosophical, and moral frameworks for evaluating coercion).

psychologist had nearly completed Lemery's evaluation; however, she was still waiting to receive all of Lemery's medical records, including those from the U. S. Department of Veterans Affairs, before she issued her final report.

On August 16, 2012, after having finally reviewed all of Lemery's medical records, the psychologist released her final evaluation in two reports. Although Lemery had a long history of mental health problems, the psychologist concluded that there was no evidence to support a finding of diminished criminal responsibility, that he was either overmastered by a delusional compulsion or that he did not know the difference between right and wrong at the time of the crimes. In a separate report, the psychologist concluded that Lemery understood the nature and object of the criminal proceedings against him and was able to assist counsel in the trial of the case; therefore, the psychologist opined that he was competent to stand trial.

During the year-long period in which Lemery's psychological evaluation was pending, trial counsel did not file a written plea of mental incompetency to stand trial. However, on the morning of trial, four days after receiving the psychologist's final report, she moved for a continuance. She argued the merits of her recently filed motion for funds to pursue an independent psychological evaluation of the defendant, and she asked for a competency hearing. The court denied counsel's motions on the

grounds that the case had been delayed for over a year, reset for trial five times between April and the end of August, and because Lemery's trial counsel had had ample opportunity to evaluate Lemery's mental health status and had chosen not to file a plea of mental incompetency to stand trial.

On August 24, 2012, the jury found Lemery guilty, and the trial court imposed sentence on September 5, 2012. About a year later, Lemery's appellate counsel sought funds for a post-trial psychological evaluation to aid her in determining whether Lemery's trial counsel had been deficient in waiting until the eve of trial to request an independent psychological evaluation. In denying appellate counsel's motion, the trial court made factual findings supporting its conclusion that there was no objective basis for a second evaluation. For example, the court stated that, "[d]uring the trial, the court saw no evidence that contradicted [the psychologist's] opinion." Further, the court saw no evidence during trial that Lemery was unable to participate in the proceedings or to communicate with his attorney. The court found that Lemery's letters to the court concerning his case were "sensible and reasonably well-written." Lemery had expressed concerns about his ability to afford an attorney, had complained about lack of access to a law library, and had informed the court that he had been found incompetent by the U. S. Navy and the Social Security

13

Administration. He had filed a pro se request for a mental evaluation, and he had pointed out alleged errors in his arrest warrants. The court also reviewed the evidence adduced against Lemery at trial, including evidence from "the myriad of witnesses, many of whom lived in the defendant's house," and concluded that the evidence failed to show "anything that would support a conclusion that [Lemery] was legally insane during [the] course of [his] criminal conduct."

Thereafter, Lemery's appellate counsel filed a motion for new trial, raising one ground for relief, that trial counsel rendered ineffective assistance when she failed to timely request funds for an independent psychological examination. Following a hearing at which both Lemery's trial counsel and the guardian ad litem testified, the court denied the motion.

Trial counsel testified during the hearing on Lemery's motion for a new trial that she had been prepared for trial. She had met with Lemery, had reviewed voluminous discovery, independently investigated the case, had negotiated a plea offer (which Lemery rejected), and had worked with the guardian ad litem in obtaining all of Lemery's medical records.

Counsel testified that she knew by the end of July 2012 that the court-appointed psychologist had concluded that Lemery was competent to stand trial and

14

that her report would reflect that. She testified that she did not ask for an independent psychological evaluation at that time because she was not sure that she needed one. Counsel testified that she found Lemery to be "a smart guy" who read through the State's discovery and who could communicate with her and assist in his defense. Lemery addressed the court during a motion hearing, he helped counsel formulate questions to ask witnesses, and he never gave counsel any indication that he had committed the crimes while legally insane. Nevertheless, counsel moved for a continuance and for funds for an independent evaluation after reviewing the psychologist's report, stating that she saw evidence in Lemery's childhood medical records that led her to suspect that Lemery may have had more complex and deep-seated psychological problems than she had earlier believed.

Lemery's guardian ad litem also testified that she had met with him on many occasions to discuss his medical records and that she had found him to be cooperative. She had also corresponded with him. He provided her with the names of doctors who had treated him. She had discussed with and obtained signed medical releases from him, and she testified that Lemery appeared to understand the purpose of the medical release she obtained from him. The guardian ad litem testified that Lemery always behaved "very appropriately" with her.

After the hearing and after reviewing the entire record (including Lemery's many letters to the court), the trial court concluded that Lemery had failed to present any evidence that counsel's performance was deficient under the circumstances or that an independent psychological evaluation would have contributed anything to the defense of his case.

(a) Lemery argues that the trial court erred in failing to order, sua sponte, a hearing on the issue of his competency to stand trial.

> A trial court is to conduct, sua sponte, a competency hearing when there is information which becomes known to it, prior to or at the time of the trial, sufficient to raise a bona fide doubt regarding the defendant's competence. The salient question is whether the trial court received information which, objectively considered, should reasonably have raised a doubt about the defendant's competency and alerted the trial court to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense.

(Citation and punctuation omitted.) *Lytle v. State*, 290 Ga. 177, 179 (3) (718 SE2d 296) (2011). In determining whether such a hearing is required, the focus is on "any evidence of the defendant's irrational behavior, the defendant's demeanor at trial, and any prior medical opinion regarding the defendant's competence to stand trial."

16

(Citation omitted.) *Traylor v. State*, 280 Ga. 400, 404 (4) (a) (627 SE2d 594) (2006). In this case, the trial court had before it a psychologist's finding, based upon a recent evaluation and a review of Lemery's medical history, that he was competent to stand trial. As recounted above, the court also observed that Lemery appeared to appreciate his circumstances and that he was able to communicate both with the court and his attorney, and the court observed nothing in Lemery's behavior to suggest that he was otherwise incompetent to stand trial. Thus, this claim of error is without merit. See *Traylor v. State*, 280 Ga. at 404-405 (4) (a).

(b) Lemery also argues that the trial court erred in denying appellate counsel's post-conviction motion for funds for an independent psychiatric evaluation.

"The grant or denial of a motion for independent psychiatric examination lies within the discretion of the trial court and will not be overturned unless an abuse of discretion is shown." (Citation, punctuation, and footnote omitted.) *Pullins v. State*, 232 Ga. App. 267, 269 (2) (501 SE2d 612) (1998). In this case, as in *Pullins*, the trial court granted the initial motion for a psychological examination and ordered that Lemery be evaluated both as to his mental competency to stand trial and his competency at the time of commission of the offense. As outlined above, the psychologist opined that Lemery was competent to stand trial and legally sane at the

17

time of the offense, and the record contains no contradictory proof demonstrating that Lemery was unable to intelligently participate during trial so as to call into question the existing psychological findings. Under these circumstances, we find no abuse of discretion in the denial of Lemery's post-conviction motion for an independent psychological evaluation. See id.

(c) The trial court did not err in denying Lemery's motion for a new trial on the ground of ineffective assistance of trial counsel.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984)[.] The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct.

(Citations and punctuation omitted.) *Robinson v. State*, 277 Ga. 75, 75-76 (586 SE2d 313) (2003). See also *Miller v. State*, 285 Ga. 285, 286 (676 SE2d 173) (2009) (In analyzing the prejudice element, "[t]he question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt.") (citation and punctuation omitted). Failure to satisfy either

18

prong of the *Strickland* standard is fatal to an ineffective assistance claim. *Goodwin v. Cruz-Padillo*, 265 Ga. 614, 615 (458 SE2d 623) (1995); *Ponder v. State*, 201 Ga. App. 388, 389 (1) (411 SE2d 119) (1991). As the appellate court, "[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Robinson v. State*, 277 Ga. at 76.

Trial counsel requested and obtained a full psychiatric evaluation of Lemery. She testified during the motion hearing that she believed that the evaluation was fair and that she had no reason to disagree with it. She moved for a continuance and for additional testing, however, only upon discovering information in Lemery's records indicating that his mental health problems may have been more pervasive than she had earlier suspected. Lemery has not shown that his counsel unreasonably relied on the psychological evaluation or that her efforts on the eve of trial constituted deficient performance. Moreover, Lemery has presented no evidence from which the court could infer that an independent evaluation would have yielded conclusions that were contrary to those of the first evaluation. Consequently, the trial court did not err in concluding that Lemery failed to carry his burden of showing that his trial counsel was ineffective. See *Whitus v. State*, 287 Ga. 801, 803-804 (2) (700 SE2d 377) (2010)

(ordinarily in a non-capital case the decision to forego or curtail an investigation of the accused's mental health is reasonable when an expert has determined that the defendant is fit to stand trial or was sane at the time of the offense).

*Judgment affirmed. Phipps, C. J., and McMillian, J., concur*.