# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 12-3874

———————————————

United States of America

*Plaintiff - Appellee*

v.

Lawrence Lalonde Colton

*Defendant - Appellant*

————————

Appeal from United States District Court
for the District of Minnesota - St. Paul

————————

Submitted: November 22, 2013
Filed: February 5, 2014
[Published]

————————

Before RILEY, Chief Judge, BRIGHT and KELLY, Circuit Judges.

————————

PER CURIAM.

A jury convicted Lawrence Lalonde Colton of one count of conspiracy to distribute various controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846, as well as three counts of distribution of a controlled substance in violation of 21

U.S.C. § 841(a)(1) and 18 U.S.C. § 2. At sentencing, the district court[1] varied downward from Colton's advisory range of 360 months to life under the United States Sentencing Guidelines (the Guidelines) and imposed a 300-month sentence. Colton appeals his conviction. We affirm.

## I.    Background

On February 22, 2012, a grand jury indicted Colton on one count of conspiracy to distribute oxycodone, oxymorphone, hydromorphone, and heroin; one count of conspiracy to distribute oxycodone, oxymorphone, and heroin; one count of distribution of oxymorphone and heroin to a person under 21 years of age; and three counts of distribution, or aiding and abetting the distribution, of oxymorphone. Colton pled not guilty to the charges. Prior to jury selection, the Government dismissed one count of conspiracy and the count of distribution to a person under 21. A four-day jury trial on the remaining counts began on August 13, 2012.

At trial, the Government introduced evidence that, between 2009 and 2011, Colton, along with co-conspirators Jeffrey Liddell and Cletis Portis, led a large-scale drug operation in the Twin Ports of Duluth, Minnesota, and Superior, Wisconsin. During the initial stages of the operation, Colton located drugs in his hometown of Detroit, Michigan, and arranged for them to be transported to the Twin Ports for distribution. As the operation progressed, Colton spent more time in the Twin Ports distributing the drugs to dealers. Colton and his co-conspirators regularly wired drug proceeds obtained in the Twin Ports to their sources in Detroit.

Multiple witnesses testified that Colton coordinated with others to purchase, transport, and distribute prescription drugs. Liddell testified that he sold drugs with

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Colton "[h]undreds of times" and admitted to distributing at least 35,000 prescription drug pills that he primarily obtained from Detroit sources. Angelique Vos confirmed that Colton, Liddell, and Portis obtained drugs in Detroit and transported them to the Twin Ports for distribution. Vos admitted to wiring drug proceeds and obtaining pills from Colton on 30-50 occasions. Krystal Willis testified that Colton gave her pills to transport from Detroit to the Twin Ports and instructed her to conceal the pills in her vagina. Angela Sanchez testified that she met Colton through Liddell, and that she wired drug proceeds and transported pills from Detroit on multiple occasions. On one occasion, Sanchez observed Colton giving Liddell approximately 700 pills to distribute.

The Government also called several low-level dealers who testified that they obtained pills from Colton. Dan Stenzel testified that in the summer of 2010, Colton gave him pills two to five times per week. Dillon Beyers testified that Liddell referred him to Colton who fronted him pills to sell. Stenzel and Beyers admitted that they each distributed at least 1,500 pills. In addition, Chad Staton testified that he purchased pills at Colton's apartment on multiple occasions during the summer of 2011.

Special Agent Nicolas Garlie testified that law enforcement seized Colton's cell phone, which had various co-conspirators' phone numbers saved on it. He stated that a significant amount of phone calls and text messages were sent between Colton's phone and co-conspirators' phones in 2011. Based on wire transfer records, Special Agent Garlie also testified that Colton sent and received a total of $62,810 in wire transfers between January 2010 and August 2011.

Finally, the Government introduced three recordings of controlled buys undertaken by law enforcement, two of which document Colton selling pills to a confidential informant. In the third recording, Veronique Muckle, an associate of Colton who lived with him in an apartment in Superior, sells pills to a confidential

informant. The pills sold by Colton and Muckle tested positive for oxymorphone.

After the Government presented its evidence, Colton moved for judgment of acquittal under Fed. R. Crim. P. 29(a). The district court took the motion under advisement. After the jury found Colton guilty on all counts, the district court denied Colton's motion for judgment of acquittal, noting that "the government offered overwhelming evidence of Colton's guilt as to all counts and all objects of the conspiracy." The district court sentenced Colton to 300 months. Colton filed a timely notice of appeal to this court.

## II. Discussion

On appeal, Colton argues that (1) the evidence is insufficient to support his conviction and (2) the district court erred in calculating the drug quantity attributable to him for the purposes of determining his base offense level under the Guidelines. We address each argument in turn.

### a. Sufficiency of the Evidence

Colton argues that because the evidence is insufficient to support each count of conviction, the district court erred by denying his motion for judgment of acquittal.

We review de novo the sufficiency of the evidence to sustain a conviction, viewing the evidence in a light most favorable to the verdict and accepting all reasonable inferences supporting the verdict. *United States v. Cuevas-Arrendondo*, 469 F.3d 712, 715 (8th Cir. 2006). We will overturn Colton's conviction "only if no reasonable jury could have found him guilty beyond a reasonable doubt." *United States v. Bell*, 477 F.3d 607, 613 (8th Cir. 2007). "Our standard of review concerning whether the evidence is sufficient to support a conviction is strict." *United States v. Savatdy*, 452 F.3d 974, 976 (8th Cir. 2006).

Colton argues that his conviction cannot stand because it is based on the unreliable testimony of his co-conspirators, all of whom he claims received "the deal of a lifetime" in exchange for their testimony. "However, we do not consider attacks on witnesses' credibility when we are evaluating an appeal based upon the sufficiency of the evidence." *United States v. Funchess*, 422 F.3d 698, 701 (8th Cir. 2005); *see also United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010) ("This court does not weigh the evidence or the credibility of the witnesses."). Indeed, "[q]uestions of credibility are the province of the jury." *United States v. Chavez*, 230 F.3d 1089, 1091 (8th Cir. 2000). Because the evidence presented by the Government at trial, if believed, establishes Colton's guilt beyond a reasonable doubt, we conclude that the evidence is sufficient to support each count of his conviction.

## b.     Drug Quantity Calculation

Next, Colton argues that the district court erred in calculating the drug quantity attributable to him for the purposes of calculating his base offense level under the Guidelines.

"[D]rug quantity and identity determinations are factual findings, which we review for clear error, applying the preponderance-of-the-evidence standard." *United States v. Walker*, 688 F.3d 416, 420 (8th Cir. 2012) (citation omitted) (internal quotation marks omitted). The district court's "factual determinations will stand 'unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made.'" *United States v. Miller*, 511 F.3d 821, 823 (8th Cir. 2008) (quoting *United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (8th Cir. 2003)).

At his sentencing hearing, Colton objected to the Government's position that he is responsible for 7,172 OxyContin pills and 9,553 Opana pills as suggested in the

pre-sentence investigation report. The district court subsequently held an evidentiary hearing during which the Government called Special Agent Garlie to explain how the Government arrived at its proposed drug quantity. Garlie explained that the quantity derives from records introduced at trial showing that individuals wired a total of $334,494 as part of the drug conspiracy. The Government divided the $334,494 amount by $20, which represents the highest amount paid for a pill based on testimony at trial, to arrive at a total of 16,725 pills. The Government classified 7,172 of those pills as Oxycontin pills and 9,553 as Opana pills based on the trend in sales of each drug that police observed during the dates of the conspiracy. Using Drug Equivalency Tables at Guidelines section 2D1.1, Application Note 10D, the Government concluded that the above-referenced pills amount to 15,354 kilograms of marijuana equivalent. Under section 2D1.1(c)(2) of the Guidelines, such an amount dictates a base offense level of 36. Over Colton's objection, the district court adopted the Government's drug quantity calculation.

Colton argues that the district court erred by not limiting the drug quantity to the pills recovered by confidential informants during the controlled buys. However, for purposes of calculating drug quantity in a drug conspiracy case, "the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." *United States v. Bradley*, 643 F.3d 1121, 1126 (8th Cir. 2011) (quoting *United States v. Rodriguez*, 484 F.3d 1006, 1014 (8th Cir. 2007)). The district court "may consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy." *United States v. Plancarte-Vasquez*, 450 F.3d 848, 852 (8th Cir. 2006). Notably, Colton does not allege a lack of knowledge or foreseeability with respect to any portion of the drug quantity attributed to him. Rather, he concedes that the reasonable foreseeability standard "presents a problem . . . for the defense." Colton fails to articulate any legal or factual basis for concluding that the Government's drug quantity calculation was in error.

Colton further argues that the district court erred by relying on "a mathematical calculation and not direct evidence" in making its drug quantity determination. Again, our case law does not support Colton's argument. In the context of a drug conspiracy case, "[t]he trial court is entitled to estimate drug quantities where the amount actually seized fails to represent the scale of the offense if the preponderance of the evidence supports the quantities." *United States v. Roach*, 164 F.3d 403, 413 (8th Cir. 1998) (citing U.S.S.G. § 2D1.1, cmt. (n.12)). In so doing, "[t]he court may make a specific numeric determination of quantity based on imprecise evidence." *Id.* Thus, it is of no consequence that the district court's drug quantity determination was based on a mathematical calculation as opposed to direct evidence. Although calculating drug quantity may not be the best manner of determining a proper sentence in drug cases, that method has been approved in the Guidelines and our case law.

In light of the record, we conclude that the evidence supports the district court's drug quantity calculation.

## III.    Conclusion

For the foregoing reasons, we affirm.

_____