# United States Court of Appeals

## For the Eighth Circuit

_____

Nos. 18-2068, 18-2088, 18-2090

_____

United States of America

*Plaintiff - Appellee*

v.

Gregorio Ramirez-Maldonado;
Alejandro Llamas-Delgado;
Erick Parra-Salazar

*Defendants - Appellants*

_____

Appeals from United States District Court
for the District of Minnesota

_____

Submitted: March 12, 2019
Filed: June 26, 2019

_____

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Alejandro Llamas-Delgado ("Llamas") and Erick Parra-Salazar ("Parra") appeal their convictions for drug trafficking crimes. Parra and another co-defendant,

Gregorio Ramirez-Maldonado ("Ramirez"), appeal the sentences the district court[1] imposed after trial. We affirm.

## I. Background

In May 2017, law enforcement officials arrested Llamas, Ramirez, and Parra following an extensive investigation into a suspected drug conspiracy to distribute substantial quantities of methamphetamine and cocaine. Because both Llamas and Parra challenge the sufficiency of the evidence, many of the facts introduced at trial regarding that investigation are recounted below.

## A. Facts

For purposes of this case, the investigation began in 2014 when the Drug Enforcement Administration ("DEA") intercepted a transport truck in California that was hauling a 2005 Mini Cooper automobile. Earlier, Omar Ornelas-Garcia ("Ornelas") and A.L., a confidential informant who testified at trial, had met Llamas at an auto body shop in southern California that had constructed hidden compartments in the Mini Cooper. A.L. later picked up the Mini Cooper after Ornelas told him that he had loaded it with 22 pounds of methamphetamine and seven or eight kilograms (15.4 or 17.6 pounds) of cocaine. A.L. met with a truck driver to load the Mini Cooper onto the transport truck and subsequently sent a text to Llamas to tell him the Mini Cooper was on its way. The DEA learned about the transport truck and set up a "controlled delivery" of the Mini Cooper. The DEA met the truck driver at a parking lot in Plymouth, Minnesota, unloaded the vehicle, parked it, and disabled it. The truck driver then called someone named "Oscar," whom he had been told to call when he arrived.

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

The DEA encountered Llamas during the controlled delivery of the Mini Cooper. Almost an hour after the truck driver's phone call to "Oscar," Llamas and a woman pulled into the parking lot. Llamas met with the truck driver, put California license plates on the Mini Cooper, and unsuccessfully tried to start it. Llamas eventually returned with several other people and a tow truck. They loaded the Mini Cooper on the tow truck and departed. The DEA did not arrest anyone but had local police seize the Mini Cooper from the tow truck.

In September 2015, the DEA again saw Llamas when agents were at the Albertville Outlet Mall just west of the Twin Cities. Llamas sat on a park bench holding two cell phones. A short time later, Eric Winter drove into the parking lot. Llamas walked directly to Winter's vehicle and got into the front passenger seat. A few minutes later, Llamas got out of the vehicle, walked to his own vehicle, and drove off. Police officers stopped Llamas and Winter. The officers found about an ounce of methamphetamine in the center console of Winter's vehicle and $1,880 cash on Llamas. The record indicates they arrested Llamas but does not indicate whether any further proceedings occurred.

In January 2017, police officers began extensive surveillance that included watching two houses linked to Llamas. These houses were a large, single-family home on Bellvue Lane in Brooklyn Center (the "Bellvue House") and a small rambler-style home on Dupont Avenue in Minneapolis (the "Dupont House"). The officers also identified several vehicles linked to Llamas, including a Chevrolet Silverado and a GMC Sierra. Between January and May 2017, Llamas often drove between the two houses. Llamas would meet with various people and engage in "short term traffic," only staying at residences for a short time. The officers testified Llamas would travel to locations using non-direct routes and side streets and would circle around the block in a manner consistent with one conducting counter-surveillance. They did not observe Llamas engage in any conventional work activities.

-3-

In February 2017, police officers encountered Llamas and Ramirez when tracking a cell phone that Llamas has previously contacted. The officers had set up surveillance at a travel plaza near Albert Lea, Minnesota. They spotted Ramirez driving a Honda registered to Jacqueline Myra Machuca-Arana ("Machuca") with a passenger they later identified as Machuca. The officers followed the vehicle to the Dupont House. Llamas arrived and met with Machuca and Ramirez. Machuca returned to the Honda and drove into the garage. Soon after, Llamas left the residence carrying a duffle bag and headed toward the garage. Llamas then drove away in another vehicle, while Ramirez and Machuca drove off in Llamas's Chevrolet. Ramirez and Machuca returned to the Dupont House later that night. The next evening, the officers located Ramirez and Machuca out driving the Honda, stopped the car, and seized $20,000 in cash from a modified storage area in the rear seat.

In March 2017, police officers received information from investigators in California that Llamas would be meeting with a money courier. The officers tracked Llamas and an unknown male to a hotel near the Mall of America in Minnesota. They also noted a car parked at the hotel: a Honda Odyssey with California plates registered to Hubert Cuevas. Cuevas and Llamas talked 28 times by phone that day. Two days later, officers stopped Cuevas in the Honda Odyssey in California and seized $53,000 in cash from a hidden compartment in his vehicle.

In April 2017, police officers learned about a call between Llamas and Ornelas, who they suspected was a drug associate of Llamas. During the call, Ornelas used coded language interpreted by police officers to mean suppliers in Mexico had stopped sending drugs because the suppliers had not been paid. Ornelas and Llamas discussed a plan for Llamas to provide money to a courier in Minnesota to settle the debt. During a later call, Ornelas told Llamas the courier was in the area, and Llamas agreed to meet the courier.

-4-

That same afternoon, police officers intercepted three phone calls and some text messages between Llamas and Ishmael Torrecillas, the courier. The two men agreed to meet at the Mall of America. Llamas left the Bellvue House in the Chevrolet. When Llamas arrived, Torrecillas and his girlfriend got into Llamas's vehicle. The officers did not follow Llamas after that meeting.

In May 2017, a pole camera at the Dupont House recorded Parra and Ramirez arriving in Ramirez's Cadillac Escalade. Llamas met Parra and Ramirez there. Parra and Ramirez then drove the Cadillac to the Bellvue House, and Llamas followed in a separate vehicle. Parra drove the Cadillac into the Bellvue garage and the door closed. About twenty minutes later, Parra backed the Cadillac out, and he and Ramirez returned to the Dupont house. Ramirez later told police two kilograms of cocaine had been concealed behind the headlights of the Cadillac.

On May 15, 2017, police officers arrested Llamas, Ramirez, and Parra, and searched several locations linked to the investigation. At the Bellvue House, police found Llamas, roughly $43,000 in cash, a cell phone, vehicle keys, and a permanent resident card with Llamas's photograph. At the Dupont House, the officers found Parra and Ramirez, drugs, and extensive drug paraphernalia. It appeared no one resided at the house, as there were no pictures on the walls, no food in the refrigerator, no dining utensils, and no dry goods in the kitchen. The officers seized about 139 grams of cocaine sitting on a top shelf in the kitchen, about 252 grams of cocaine in the kitchen broiler, 28 pounds of marijuana in the basement, a digital scale, disposable latex gloves, a handgun, food saver bags, a heat-sealing machine, packaging tape, a money counting machine, and two kilogram-sized wrappers. They also found hidden compartments behind the front headlights of the Cadillac.

## B. Procedural History

In June 2017, a grand jury indicted Llamas, Ramirez, and Parra on two counts: (1) conspiracy to distribute 500 grams or more of methamphetamine and 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and (2) possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1). At trial in December 2017, a jury convicted all three defendants on both counts. The jury found, however, that Ramirez's and Parra's conduct involved no methamphetamine and that Parra's conduct involved less than 500 grams of cocaine.

The district court sentenced Llamas to 300 months of imprisonment. Llamas does not challenge his sentence on appeal.

The district court sentenced Parra to 41 months of imprisonment. The district court concluded based on the evidence it heard at trial that Parra was responsible for more than 500 grams of drugs. Thus, it calculated the U.S. Sentencing Guidelines Manual ("Guidelines" or "U.S.S.G.") range as 51 to 63 months. The district court then varied downward to 41 months. The district court referenced this was the bottom of the "imaginary" Guidelines range that would apply if the sentence were based on less than 500 grams of drugs and explained it was varying downward because it thought the applicable Guidelines range was "more than is necessary" for Parra.

The district court sentenced Ramirez to a bottom-of-the-Guidelines sentence of 63 months of imprisonment. Ramirez argued for application of the safety valve provision and a reduction in his sentence based on U.S.S.G. § 3B1.2 because he had only a minor role in the conspiracy. The district court rejected the argument. It noted that Ramirez recruited Parra to join the conspiracy. The district court then determined

63 months was appropriate because of Ramirez's immigration status, his family situation, and because the Government did not ask for more.

All three defendants timely appealed.

## II. Analysis

Because Llamas and Parra challenge the sufficiency of the evidence, we address the evidence at trial for those two defendants before addressing the two sentencing issues.

### A. Sufficiency of the Evidence

"We review de novo the sufficiency of the evidence to sustain a conviction, viewing the evidence in a light most favorable to the verdict and accepting all reasonable inferences supporting the verdict." *United States v. Colton*, 742 F.3d 345, 348 (8th Cir. 2014). This is a strict standard of review, and we will overturn a conviction "only if no reasonable jury could have found [the defendant] guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Bell*, 477 F.3d 607, 613 (8th Cir. 2007)). "It is well-established that 'the uncorroborated testimony of an accomplice is sufficient to sustain a conviction if the testimony is not otherwise incredible or unsubstantial on its face.'" *United States v. Vaughn*, 410 F.3d 1002, 1004 (8th Cir. 2005) (quoting *United States v. Dunn*, 494 F.2d 1280, 1281–82 (8th Cir. 1974)).

To establish a defendant's membership in a conspiracy, the Government needs to prove "(1) the existence of an agreement among two or more people to achieve an illegal purpose, (2) the defendant's knowledge of the agreement, and (3) that the defendant knowingly joined and participated in the agreement." *United States v. Peebles*, 883 F.3d 1062, 1067–68 (8th Cir. 2018) (quoting *United States v. Whirlwind Soldier*, 499 F.3d 862, 869 (8th Cir. 2007)). To establish a defendant's possession

of illegal drugs with the intent to distribute, the Government needs to prove the defendant (1) knowingly possessed the drug in question and (2) intended to distribute it. *See id.* at 1068.

The evidence of Llamas's guilt was overwhelming. First, Llamas participated in using a modified Mini Cooper to transport drugs. Llamas protests that evidence of his role was primarily based on the confidential informant's testimony, but his participation in picking up the Mini Cooper confirms his role in that transaction. Second, police officers' surveillance of the outlet mall and subsequent discovery of drugs with Winter could allow a reasonable jury to infer that Llamas sold drugs to Winter. Third, Llamas was repeatedly present at the Dupont House where police officers found drugs (and no evidence anyone lived there). While this is not an exhaustive recollection of the evidence against Llamas, this evidence alone prevents any reasonable argument that the evidence was insufficient to convict Llamas.

The evidence of Parra's role in the conspiracy to distribute drugs was also sufficient. First, circumstantial evidence indicated Parra helped Ramirez transport two kilograms of cocaine and distribute it to Llamas for further distribution. Second, police officers found Parra at the House with drugs and other drug paraphernalia. This evidence, taken in the light most favorable to the verdict, supports the reasonable conclusion Parra had a role in the drug conspiracy and possessed drugs with intent to distribute them. Thus, ample evidence supports Parra's conviction.

## B. Parra's Drug Quantity at Sentencing

Parra argues the district court committed procedural error in calculating his Guidelines range by holding him accountable for more cocaine than found by the jury. We review de novo the legal question of whether the district court could find a higher quantity of drugs than the jury found. *See United States v. Webb*, 545 F.3d 673, 676–77 (8th Cir. 2008). This court has held "a district court may impose a

sentence based on a drug quantity determination greater than that found by the jury so long as the sentence does not exceed the statutory maximum of the convicted offense and the district court's calculation is supported by sufficient evidence." *Id.* at 677. Parra tries to distinguish *Webb* on the ground it involved a jury finding with only one option for drug quantity rather than a finding among multiple options. That distinction in the jury form does not evade *Webb*'s core holding that a district court's sentencing finding may exceed the jury's finding on drug quantity. The district court did not err in following our precedent.

We also see no indication the district court committed a clear error in calculating the drug quantity on the evidence presented. The calculation is a factual determination reviewed for clear error. *Id.* Police officers seized over 445 grams of cocaine and two kilogram-sized wrappers from the stash house where Parra was staying. Ramirez also told police officers Parra helped transport two kilograms of cocaine from Texas to Minnesota. This evidence is sufficient under a preponderance of the evidence standard. *See United States v. Eberspracher*, 936 F.2d 387, 389 (8th Cir. 1991) (affirming attributing four kilograms of cocaine to a defendant based on finding four kilogram wrappers at his business).

## C. Ramirez's Role in the Offense

Ramirez challenges the district court's determination that he was not entitled to a minor role reduction under U.S.S.G. § 3B1.2(b). This is also a factual determination that is reviewed for clear error. *See United States v. Cartagena*, 856 F.3d 1193, 1196 (8th Cir. 2017). The Guidelines direct district courts to decrease the offense level by two levels "[i]f the defendant was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). This court has recently explained "this deduction is available where the defendant's role 'makes him substantially less culpable than the average participant in the criminal activity.'" *United States v. Sharkey*, 895 F.3d 1077, 1081 (8th Cir. 2018) (quoting U.S.S.G. § 3B1.2 cmt. n.3). It is the defendant's

burden to establish both that "he or she is [a] minor participant by comparison with other participants *and* by comparison with the offense for which he or she is accountable." *Id.* (alteration in original) (quoting *United States v. Bradley*, 643 F.3d 1121, 1129 (8th Cir. 2011)). "[T]his court has consistently rejected the argument that a distributor of controlled substances deserves a minor-role reduction simply because of the presence of a larger-scale upstream distributor." *Id.* (quoting same).

The district court's decision to deny a minor-role reduction to Ramirez was consistent with the evidence. The jury heard evidence that Ramirez was involved in the conspiracy for at least three months and delivered drugs to Llamas on at least one if not two occasions. We have repeatedly found no clear error in the denial of a minor-role reduction on similar facts. *See, e.g.*, *United States v. Almazan*, 552 F. App'x 610, 611 (8th Cir. 2014) (unpublished) (finding no clear error where defendant admitted knowledge of transporting hidden cocaine in the vehicle he was driving and received $1,000 for transporting the cocaine); *United States v. Pruneda*, 518 F.3d 597, 606 (8th Cir. 2008) (finding no clear error where defendant was merely a courier); *United States v. O'Dell*, 204 F.3d 829, 838 (8th Cir. 2000) (finding no clear error where defendant was less culpable than co-defendants but helped transport drugs several times). We see no distinguishing reason to find clear error here.

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____