# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-3051
_____

United States of America

*Plaintiff - Appellee*

v.

Jovan J. Denson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: April 17, 2020
Filed: July 22, 2020

_____

Before SMITH, Chief Judge, BENTON and KOBES, Circuit Judges.

_____

SMITH, Chief Judge.

Jovan J. Denson pleaded guilty to conspiracy to distribute 1,000 grams or more of heroin, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 851; distribution of heroin, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 851; possession of heroin, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 851; and money laundering, *see* 18 U.S.C. § 1956(a)(1)(B)(i). The district

court[1] sentenced Denson to 292 months' imprisonment. Denson argues that the district court procedurally erred in calculating his sentence and that his sentence is substantively unreasonable. We affirm.

## I. *Background*

In early 2016, officers in Springfield, Missouri, began investigating an increase in heroin trafficking. Eventually, officers confronted a seller, Amy Mitchell, who identified Denson as one of her sources. After a few controlled buys, officers requested and obtained multiple wiretap warrants for Denson's phones. The wiretaps intercepted calls and texts of Denson selling heroin to or with several individuals, including Mitchell, Brian Brown, Edward Smith, Earl Jones, Deanna Miller, and Claude Davis.[2] Police stopped and searched a car driven by Denson's suspected drug courier. They also searched Denson's home. These searches led to the seizure of 1,485 grams of heroin.

After his arrest, Denson pleaded guilty to several counts arising out of his drug activity. The presentence investigation report (PSR) described the conspiracy as involving either 25,153 or 28,000 grams of heroin and recommended a base offense level of 34. *See* U.S.S.G. § 2D1.1(c)(3). It also recommended a two-level criminal-livelihood enhancement and a four-level organizer-or-leader enhancement. *See id*. § 2D1.1(b)(16)(E); *id*. § 3B1.1(a). Denson objected to the base offense level and the enhancements.

---

[1]The Honorable Stephen R. Bough, United States District Judge for the Western District of Missouri.

[2]While out of jail on bond, Davis died of a heroin overdose. Davis also sold heroin to Benjamin Goodman, who sold to Shawn Smith. Smith died from opioid abuse and had heroin in his system when he died.

At the sentencing hearing, the government called four witnesses to support the PSR's recommendations. These included three of Denson's customers and an officer who investigated the conspiracy.

Mitchell testified that she purchased drugs from Denson and another individual working for Denson called "Cuz." Mitchell did not recall exact dates but stated she began buying from Denson before November 2016 and stopped in May 2017. As for quantities, she began purchasing one to three grams from Denson at a time. This increased to 10 to 20 grams at a time.

The government also called Brown, who was Mitchell's boyfriend. The two often made drug purchases together. Brown first purchased from Denson in late 2014 or early 2015. He began purchasing from him again around March 2016. Initially, Brown purchased "grams here and there." Sent. Tr. at 25, *United States v. Denson*, No. 6:17-cr-03077-SRB-1 (W.D. Mo. Oct. 15, 2019), ECF No. 515. Brown stated that he bought two to five grams per day for the first four to six months. A little before Christmas in 2016, he began purchasing much larger quantities—"approximately 20" (but "more like 30 to 40") grams a day. *Id.* at 27. This continued until May 2017.

Smith testified that he purchased from Denson for 10 to 12 months. For the first five months, he only bought one or two grams a day. There were periods of a week or two at a time, however, when Smith could not contact Denson. Over the next four-or-five-month span, Smith increased his buys to two and then five grams a day. By the final month or month and a half, Smith purchased 20 grams every day or every other day. Smith also testified that, on one occasion, Denson had a woman in a blue van deliver drugs for him.

Lastly, the government called Officer Nick Mittag. Mittag testified that officers intercepted calls and texts from Denson's cell phones from April 4, 2017, to April 28, 2017, and from May 10, 2017, to May 16, 2017. Mittag reviewed the calls and texts

and compiled a document ("Exhibit 3") that chronicled the date, buyer, and amount of drugs involved for each referenced transaction. If he was uncertain as to the quantity, Mittag either placed a lower amount or left the quantity blank.

Mittag also conducted surveillance of Denson. Based on that intelligence, he believed Denson was not employed and spent his time at home or selling drugs. Mittag admitted, however, that he did not observe Denson every day and that Denson went to school to get his HVAC certification.

Mittag testified that officers seized 780 grams from Denson's suspected courier and roughly half that amount from bushes outside of Denson's home. They found the latter after Denson directed his girlfriend to remove the drugs. Mittag claimed another individual provided Denson's stash house. Officers also found $11,000 on Denson during a stop and search when Denson was traveling back from Chicago.

In light of this evidence, the district court reduced Denson's base offense level to 32. Specifically, the court believed the customers' testimonies indicated that the final month-and-a-half was the peak of Denson's activity, and Exhibit 3 supported a finding that 1,000 grams of heroin were sold over that period. Based on the total evidence, the district court found that the whole 15-month conspiracy involved 3,000 to 10,000 grams. *See* U.S.S.G. § 2D1.1(c)(4).

Next, the court overruled Denson's objection to the recommended criminal-livelihood enhancement. That enhancement required proof that (1) Denson made more than $14,500 from his criminal activity, and (2) the criminal activity constituted Denson's primary source of income. The court found those requirements were satisfied because Denson lacked a job; Denson used $9,500 in cash to purchase an Audi; and officers seized $11,000 from Denson when they arrested him.

Third, the court applied a three-level manager-or-supervisor enhancement instead of the PSR's recommended four-level organizer-or-leader enhancement. *See id.* § 3B1.1(b). The court found the conspiracy involved five or more participants and that Denson directed at least one. *See id.*

The district court's rulings on drug quantity and enhancements reduced the Guidelines range from 292 to 365 months' imprisonment to 210 to 262 months' imprisonment. However, the district court varied upward to 292 months' imprisonment. The court based the variance on the deleterious effects of heroin use, including local deaths during the criminal activity.

## II. *Discussion*

Denson claims that the district court erred in calculating his base offense level; applying a two-level criminal-livelihood enhancement and a three-level manager-or-supervisor enhancement; and imposing a substantively unreasonable sentence.

## A. *Base-Level Calculation*

Denson contends that his base offense level was set too high because of erroneous drug quantity figures. The PSR recommended a base offense level of 34, stating that the conspiracy involved at least 10,000 grams but less than 30,000 grams of heroin. Denson argued a base level of 30 should apply; he admitted that the government seized 1,485 grams but objected to higher suggested amounts. At sentencing, the district court sustained, in part, Denson's objection. It found that the offense involved between 3,000 grams and 10,000 grams and reduced the base offense level to 32. On appeal, Denson argues that there was insufficient evidence to support a finding that the conspiracy involved even 3,000 grams.

"Drug quantity determinations are factual findings, which we review for clear error, applying the preponderance-of-the-evidence standard." *United States v. King*, 898 F.3d 797, 809 (8th Cir. 2018) (internal quotation omitted). The sentencing court's "factual determinations will stand unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." *United States v. Colton*, 742 F.3d 345, 348 (8th Cir. 2014) (per curiam) (internal quotation omitted).

When appropriate, the district court may estimate drug quantity. "When the amount of narcotics seized by the government does not reflect the scale of the drug trafficking offense, . . . the court shall approximate the quantity of the controlled substance and may consider, for example, similar transactions in controlled substances by the defendant." *United States v. Sterling*, 942 F.3d 439, 442 (8th Cir. 2019) (internal quotations omitted). "The court may make a specific numeric determination of quantity based on imprecise evidence . . . ." *United States v. Roach*, 164 F.3d 403, 413 (8th Cir. 1998).

Given these precedents, few defendants appealing estimated drug quantity findings "have cleared the high bar of clear error review." *Sterling*, 942 F.3d at 442. "That is because, almost invariably, the district court finding was based upon testimony at trial or at an evidentiary sentencing hearing—usually by suppliers or customers of the defendant—that provided the court with a reasonable basis to make a specific numeric determination of quantity based on imprecise evidence." *Id.* (internal quotation omitted).[3]

---

[3]The government argues that if there was error, Denson invited it at the sentencing hearing. In his sentencing memorandum, Denson objected to the PSR and said that the base level should be 30 rather than 34. At the hearing, Denson initially

-6-

Denson admits that law enforcement seized 1,485 grams. But he contends that the evidence does not show that the conspiracy involved the additional 1,515 grams required to support a base level of 32. We disagree. The district court may make a "numeric determination of quantity based on imprecise evidence." *Roach*, 164 F.3d at 413. For instance, in *Colton*, we upheld a quantity determination that was derived "from records introduced at trial showing that individuals wired a total of $334,494 as part of the drug conspiracy." 742 F.3d at 349. "The Government divided the $334,494 amount by $20, which represents the highest amount paid for a pill based on testimony at trial, to arrive at a total of 16,725 pills." *Id.* It then "classified 7,172 of those pills as Oxycontin pills and 9,553 as Opana pills based on the trend in sales of each drug that police observed during the dates of the conspiracy." *Id.* We permitted the district court to adopt those findings. *Id.*

And in *United States v. Moore*, we allowed estimates that were based on drug customers' testimonies. 798 F. App'x 952, 958 (8th Cir. 2020) (per curiam). There, "[o]ne witness testified that she purchased between one-half to one gram of heroin from [the defendant] every day for two years." *Id.* And "[a] second witness testified that he purchased one to two grams of heroin every day for two years. Using the conservative numbers, the court found that the first witness had purchased 365 grams from Johnson and that the second had purchased 730 grams." *Id.* The trial court's finding was determined not to be clearly erroneous. *Id.*

---

suggested that the court could find a middle ground, which appears to refer to a base level of 32. But Denson's counsel later decided to "stick with my objections and argue that we believe it's a base offense level of 30." Sent. Tr. at 61. Given that retraction, we cannot say that Denson approved the district court's base-level finding and invited the error. *See United States v. Mahler*, 141 F.3d 811, 815 (8th Cir. 1998) ("The doctrine of invited error applies when the trial court announces its intention to embark on a specific course of action and defense counsel specifically approves of that course of action." (internal quotation omitted)).

Here, the government offered similar estimations. The district court did not clearly err in relying on them. The conspiracy ran from March 2016 to May 2017. At sentencing, an officer testified that he intercepted some of Denson's calls and texts from April 4, 2017, to April 28, 2017, and May 10, 2017, to May 16, 2017. He then created Exhibit 3, which indicated the date, buyer, and amount of drugs involved. All told, Exhibit 3 attributed to Denson sales of 1,003 grams of heroin during those periods.

In addition, officers seized $11,000 during Denson's arrest. Based on testimony, that amount of cash was equivalent to 122.222 or 226.796 grams of heroin at the time of arrest.[4]

Three of Denson's customers also testified at sentencing. Even giving Denson a number of favorable inferences, these testimonies indicate that he sold the requisite amount of heroin. These inferences included assuming that (1) Brown and Mitchell always purchased together, (2) the buyers purchased every other day rather than every day, and (3) the April and May sales were limited to those indicated in Exhibit 3. The testimonies of these witnesses attributed to Denson over 1,300 grams during the conspiracy's first 13 months.[5] When combined, these sources indicated that Denson

---

[4]The officer testified that Denson sold heroin for $90/gram; at that rate, $11,000 would buy 122.222 grams. Elsewhere, he testified that $11,000 could purchase half a pound, which is approximately 226.796 grams.

[5]Taken together, Brown and Mitchell testified that they purchased two grams a day almost every day between March 2016 and December 2016. Assuming they never exceeded that amount and really purchased every other day, they purchased 306 grams during that period. That calculation discounts increases that occurred in December. Then, from January 1 to March 31, they purchased roughly 20 (but "more like 30 or 40") grams a day. Sent. Tr. at 27. Again, assuming that they only purchased on half of the days during that time period, that would be an additional 900 grams.

sold more than 3,000 grams of heroin during the conspiracy. And, it should be noted that his total does not include amounts sold during the first 13 months to other individuals mentioned in the PSR.

In sum, the district court did not clearly err in finding that the conspiracy involved between 3,000 and 10,000 grams of heroin and imposing a base offense level of 32.

## B. *Criminal-Livelihood Enhancement*

Denson next claims that there was insufficient evidence to establish that he derived a livelihood from his criminal activity. We review the district court's factual finding to the contrary for clear error. *United States v. Berry*, 930 F.3d 997, 999 (8th Cir. 2019).

Sentencing courts may increase an offense level by two levels if "[t]he defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood." U.S.S.G. § 2D1.1(b)(16)(E). For the enhancement to apply, the evidence must establish that (1) during any 12-month period, the defendant received an income from the criminal activity that was 2,000 times the federal minimum wage, and (2) during that 12-month period, the criminal activity was the defendant's primary occupation. *Id.* § 4B1.3 cmt. n.2.

---

Thus, those two purchased at least 1,206 grams from March 2016 to March 2017. Smith testified that he purchased one-to-two grams a day for five months, and two-to-five grams a day for another five months, with additional increases during the final month and a half. Assuming that (1) the last month and a half of that time period is covered by Exhibit 3, (2) he always purchased the lesser amount, and (3) he only bought every other day, Smith purchased about 77 grams during the first 5 months and 105 grams during the last 3.5 months, a total of 182 grams. When combined, those amounts equal 1,388 grams.

Denson argues that the government failed to establish either requirement. Given the current minimum wage, the government had to prove that Denson "derived more than $14,500 in income from his drug activity." *Berry*, 930 F.3d at 999. Income "refers to gross income, not net." *Id.* (emphasis omitted). Further, "a substantial cash flow from criminal activity is sufficient evidence to satisfy the 'income' requirement." *Id.*

We have previously addressed similar arguments. In *Berry*, we upheld a criminal-livelihood enhancement where "[t]he district court found that Berry wired $22,000 for drugs in a single year, that he had no significant legitimate employment, and that evidence suggested he had other large amounts of cash on hand." *Id.* at 1000. Given those findings, the district court's enhancement "could not be clearly erroneous." *Id.*

In *United States v. Morris*, there was testimony that the defendant had no income. 791 F.3d 910, 914 (8th Cir. 2015). But there was evidence "that he was selling large quantities of methamphetamine every week, always paid his rent on time, purchased a car for $13,300 in cash, paid cash for $14,000 worth of repairs and improvements on his home, and purchased several businesses." *Id.* at 914–15. Given that record, we found that the district court did not clearly err in applying the criminal-livelihood enhancement. *Id.* at 915.

Other circuits have reached similar conclusions. For example, the Second Circuit has found that the "primary occupation" requirement satisfied based largely on the market value of drugs sold. *See United States v. Pristell*, 941 F.3d 44, 54–55 (2d Cir. 2019). And, the First Circuit found that there was insufficient evidence of gainful employment where the defendant offered ambiguous letters indicating that he had worked as a barber. *United States v. Gordon*, 852 F.3d 126, 134–35 (1st Cir. 2017). The ambiguous letters could not overcome the inference that his "lucrative

drug-trafficking activities during the twelve months at issue" provided his support. *Id.* at 135.

We affirm the district court's application of the enhancement. The proof of Denson's non-employment income suffices. The government's evidence shows that Denson met the $14,500 threshold counting only his income for April and May 2017. In April, Denson paid $9,500 in cash as a down payment for an Audi. *See Morris*, 791 F.3d at 914–15 (considering amount used for car purchase and home repairs). And when he was arrested, Denson carried $11,000 in cash. Taken together, those sums alone exceed the $14,500 threshold.[6]

Additionally, at the time of his arrest, officers discovered 528 grams of heroin on Denson's property. Given that the value of heroin was $90 per gram, that heroin had a street value of $47,520. *See Pristell*, 941 F.3d at 54 (considering the fair market value of drugs). Also, the government tracker indicated that Denson entered transactions involving 1,003 grams of heroin during April and May. That heroin's street value was $90,270. In short, the government offered sufficient evidence to indicate that Denson's criminal activity yielded significantly more than $14,500 gross income.

In determining his primary occupation, we may compare evidence of gainful employment against the financial evidence discussed above. *See Berry*, 930 F.3d at

[6]Denson says that we cannot consider those sums because the government failed to show (1) that the money put down on the Audi was his and (2) that the money on his person was tied to drug use. However, in his plea agreement, he stipulated that those sums were tied to drug sales. We have discretion to rely on such stipulations. *See United States v. Dailey*, 918 F.2d 747, 748 (8th Cir. 1990) ("[T]he court may, in its discretion, rely upon stipulations between the government and the defendant in determining the facts relevant to sentencing.").

1000; *Gordon*, 852 F.3d at 134–35. Denson alleges that he made $4,500 a month working at a carpeting company and as a carpenter. But Mittag testified that he regularly observed Denson during the investigation, and Denson was either at his house or selling drugs. In other words, Denson was not observed engaging in gainful employment. The investigator admitted that he did not constantly observe Denson and that Denson was in school to obtain a HVAC certificate. Nonetheless, beyond unsupported claims, there is no evidence in the record that Denson had income-yielding employment during the conspiracy. Weighing his claims against his criminal activity's income, the district court did not clearly err. *See Gordon*, 852 F.3d at 135 (disregarding claims that the defendant was a barber as unsupported, especially when weighed against his drug income). The district court did not clearly err by enhancing Denson's sentence under U.S.S.G. § 2D1.1(b)(16)(E).

C. *Manager-or-Supervisor Enhancement*

The PSR recommended a four-level enhancement for Denson's role in the conspiracy. Denson objected. The district court sustained the objection in part, but still found that Denson was a manager or supervisor, and applied a three-level enhancement. Denson argues that the evidence did not even support that enhancement.

The Guidelines recommend a three-level enhancement if (1) "the defendant was a manager or supervisor (but not an organizer or leader)," and (2) "the criminal activity involved five or more participants." U.S.S.G. § 3B1.1(b). "The government bears the burden of proving by a preponderance of the evidence that the aggravating role enhancement is warranted." *United States v. Gaines*, 639 F.3d 423, 427 (8th Cir. 2011). The district court's application of this Guideline is reviewed de novo, while its factual findings are reviewed for clear error. *Id.* at 427–28. "We construe the terms 'manager' or 'supervisor' broadly under U.S.S.G. § 3B1.1 . . . ." *United States v. Bolden*, 622 F.3d 988, 990 (8th Cir. 2010) (per curiam) (internal quotation omitted).

"The enhancement may apply even if a defendant managed or supervised only one person in a single transaction." *United States v. Reyes-Ramirez*, 916 F.3d 1146, 1148 (8th Cir. 2019).

In *Bolden*, we found that the district court did not clearly err in applying the enhancement where the defendant "directed the activities of a co-conspirator during an attempted traffic stop in an effort to evade police detection of some narcotics." 622 F.3d at 991. And in *Moore*, we upheld the enhancement's application where the defendant's sister delivered drugs to buyers who placed orders with the defendant. 798 F. App'x at 959.

Denson managed or supervised more than one other person. Testimony showed that Denson directed his girlfriend to conceal drugs, much like the defendant who directed a co-conspirator to conceal drugs in *Bolden*. Denson's direction satisfies the "managed" requirement. But Denson did more. Evidence showed that Denson used another person's residence as his stash house. Also buyers testified that, on a few occasions, after placing orders with Denson, a man known as "Cuz" and "a woman in a blue van" made deliveries to them. Like *Moore*, that conduct supports an inference that the individuals making the deliveries worked for Denson. In addition, officers stopped one of Denson's suspected couriers. During that stop, the officers discovered 780 grams of heroin in her vehicle.

In summary, the district court heard testimony (1) that Denson directed individuals to hide, store, sell, and transport heroin, and (2) that the criminal activity involved more than five people. Therefore, it did not err in finding that Denson managed or supervised the criminal activity and applying a three-level enhancement.

## D. *Substantive Reasonableness*

Denson's final argument is that the district court imposed a substantively unreasonable sentence. We review the reasonableness of a sentence under an

abuse-of-discretion standard. *United States v. Johnson*, 619 F.3d 910, 920 (8th Cir. 2010). "A district court abuses its discretion when it (1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (internal quotations omitted). "We do not require a district court to provide a mechanical recitation of the § 3553(a) factors when determining a sentence. Rather, it simply must be clear from the record that the district court actually considered the § 3553(a) factors in determining the sentence." *United States v. Walking Eagle*, 553 F.3d 654, 659 (8th Cir. 2009) (internal quotation omitted).

Denson claims that the district court abused its discretion by (1) failing to consider mitigating factors and (2) varying upward from the Guidelines range by 30 months.

As for mitigating factors, Denson claims that the district court did not consider his history of substance abuse, lack of parental guidance, upbringing in racially concentrated poverty, and desire for treatment and change. We disagree. The relevant sentencing factors were discussed in the court's sentencing memorandum and at the sentencing hearing. Based on that discussion and the court's comments, we conclude that the district court considered Denson's mitigation evidence but found it an inadequate counterweight to other considerations in § 3553(a). *See Johnson*, 619 F.3d at 922. Therefore, the district court did not abuse its discretion in its review of Denson's proffered mitigating factors. *See id.*

As for the upward variance, the district court stated that it varied upward because of the seriousness of the offense, highlighting heroin's dangerousness and the actual deaths of individuals connected to this case. That was not an abuse of discretion. In *United States v. Reif*, a boyfriend distributed heroin to his 19-year-old

girlfriend, and she died. 920 F.3d 1197, 1198 (8th Cir. 2019). Because of that death and the defendant's heroin use, the district court varied upward 75 months and sentenced the defendant to 96 months' imprisonment. *Id.* We found that variance was reasonable. *Id.* at 1199. Here, two individuals connected to the conspiracy died. Aware of those deaths, the district court varied upward 30 months and sentenced Denson to 292 months. Given the record, that variance makes sense.

In sum, the district court adequately considered the mitigating factors and its resulting sentence was reasonable. It did not abuse its discretion.

## III. *Conclusion*

For the foregoing reasons, we affirm the judgment of the district court.

_____