# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1861
_____

United States of America

*Plaintiff - Appellee*

v.

Eli Erickson, also known as Black

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Central
_____

Submitted: February 18, 2021
Filed: June 2, 2021
_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

On November 7, 2019 a jury in the District of South Dakota convicted Eli Erickson of conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 846, and

several firearm offenses. He filed two post-trial motions. The district court[1] denied both and sentenced Erickson to 188 months' imprisonment and a five-year term of supervised release. He now appeals his conviction. We affirm.

## I.

Erickson, who is Native American, has lived on the Rosebud Indian Reservation for most of his life. The Central Division of the District of South Dakota, where Erickson's trial took place, encompasses parts of the Rosebud Indian Reservation, Crow Creek Indian Reservation, and Cheyenne River Indian Reservation. Although the 2015 United States Census Bureau Population Table for the District of South Dakota states that 25% of the Central Division's population is "American Indian or Alaska Native," no Native Americans were seated on Erickson's jury.[2]

### A.

Erickson filed a motion for new trial, asserting that the absence of Native Americans on his jury deprived him of "his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community." Taylor v.

---

[1]The Honorable Roberto A. Lange, Chief Judge, United States District Court for the District of South Dakota.

[2]Because the U.S. Census Bureau uses the term "American Indian or Alaska Native" to describe our country's indigenous people, but the parties generally use "Native American," we use both terms more or less interchangeably. Our understanding is that "[e]ither term is generally acceptable and [that they] can be used interchangeably, although individuals may have a preference." *Reporting and Indigenous Terminology*, NATIVE AMERICAN JOURNALISTS ASSOCIATION, https://najanewsroom.com/wp-content/uploads/2018/11/NAJA_Reporting_and_Indigenous_Terminology_Guide.pdf; see FTC v. Payday Fin., LLC, 935 F. Supp. 2d 926, 929 n.1 (D.S.D. 2013) (explaining that it is "appropriate . . . to refer to this nation's indigenous people as Native Americans or American Indians").

Louisiana, 419 U.S. 522, 536 (1975). The district court denied the motion. We review this issue de novo. United States v. Reed, 972 F.3d 946, 953 (8th Cir. 2020); see United States v. Rodriguez, 581 F.3d 775, 789 (8th Cir. 2009) ("Allegations of racial discrimination in jury pools involve mixed questions of law and fact, and receive de novo review."). To establish a prima facie violation of the Sixth Amendment's fair cross section requirement, Erickson must show that the representation of Native Americans in the Central Division's jury pool "is not fair and reasonable in relation to the number of such persons in the community," and "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process," among other elements. Duren v. Missouri, 439 U.S. 357, 364 (1979).

The Central Division selects potential jurors in accordance with the District of South Dakota's 2018 Plan for the Random Selection of Grand and Petit Jurors. Under the Plan, "all jurors [are] selected at random from the list of registered voters provided by the office of the South Dakota Secretary of State." Nine of the 51 qualified jurors who reported for service on the day of jury selection for Erickson's trial, or 17.6%, identified their race as American Indian or Alaska Native. The district court excused six of these potential jurors for cause, and the government exercised peremptory challenges to remove two others.[3] On appeal, Erickson does not challenge the for-cause or peremptory strikes.

Although we know the number of Native Americans who showed up for jury selection in Erickson's case, the record contains no evidence about the percentage of potential jurors on the Central Division's master jury wheel who identified as American Indian or Alaska Native at the time of Erickson's trial. It is the number of Native Americans in the jury pool, not the number who showed up for jury selection in a particular case, that is relevant to assessing the merits of a fair cross section

---

[3]Only eight of the nine potential jurors who identified as American Indian or Alaska Native were questioned during voir dire.

challenge. See United States v. Clifford, 640 F.2d 150, 155 (8th Cir. 1981) (using "the percentage of [American] Indians on the list of persons eligible for petit jury service" to assess a fair cross section claim); Euell v. Wyrick, 714 F.2d 821, 823 (8th Cir. 1983) (explaining that to resolve a fair cross section challenge we examine "the percentage of [the underrepresented group] who served on venires during the time period in which the defendant was tried"); see also Berghuis v. Smith, 559 U.S. 314, 323 (2010) (relying on "the percentage of [the underrepresented group] in the jury pool . . . in the six months leading up to [the defendant's] trial" to evaluate a fair cross section challenge ). Because Erickson has not presented evidence about the number of Native Americans in the Central Division's jury pool, he necessarily has failed to show that their representation in that pool was "not fair and reasonable in relation to the number of [Native Americans] in the community." Duren, 439 U.S. at 364.

But even assuming Native Americans are underrepresented in the Central Division's jury pool, as the district court suggests they may be, Erickson has not shown the underrepresentation "is due to systematic exclusion of the group in the jury-selection process." Id. He makes two arguments in support of his assertion that Native American are systematically excluded from the jury pool. The first is that the Central Division's use of voter registration polls to populate the master jury wheel excludes Native Americans because they register to vote in a lower proportion than the general population.

This first argument is foreclosed by our precedent. The practice of using voter registration rolls to compile the master jury wheel is expressly permitted under the Jury Selection and Service Act of 1968, which governs the manner for selecting federal jurors. See 28 U.S.C. § 1863(b)(2). And we have consistently held "that a jury selection plan based on registered voter lists withstands constitutional scrutiny unless there is [otherwise] a showing of systematic exclusion of [the underrepresented group] in the jury selection process." Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996); see Clifford, 640 F.2d at 156 ("The mere fact that one identifiable group of

-4-

individuals votes in a lower proportion than the rest of the population[, standing alone,] does not make a jury selection system illegal or unconstitutional."). To demonstrate systematic exclusion, Erickson must provide additional evidence in support of his claim, such as "a defect in the [jury selection] process itself that serves to exclude [the underrepresented group]," "that the voter registration . . . requirements impose . . . discriminatory qualifications on applicants," or "that the administration of the juror selection plan is discriminatory." United States v. Warren, 16 F.3d 247, 252 (8th Cir. 1994); see United States v. Sanchez, 156 F.3d 875, 879 (8th Cir. 1998) (suggesting that systematic exclusion may be established by presenting evidence that an underrepresented group "face[s] obstacles in the voter registration process"). On this record Erickson has not provided any explanation for how the Central Division's reliance on voter registration rolls otherwise operates to systematically exclude Native Americans from criminal jury pools. As a result, he is missing another required element of his prima facie case.

Erickson's second argument concerning systematic exclusion is that "the remote, small and cohesive [nature of] Indian Reservations located in Central South Dakota" makes it impossible to empanel "a jury drawn from a fair cross section of [his] community." Taylor, 419 U.S. at 527. But this is a challenge to the final composition of the jury, rather than to the composition of the jury pool. The Sixth Amendment's fair cross section requirement applies only to the latter. In Taylor v. Louisiana, the Supreme Court was careful to "emphasize[] that in holding that petit juries must be drawn from a source fairly representative of the community [it] impose[d] no requirement that petit juries actually chosen must mirror the community." 419 U.S. at 538. Indeed, the Supreme Court has never used the fair cross section principle "to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." Lockhart v. McCree, 476 U.S. 162, 173 (1986). Rather, Taylor requires only that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not . . . fail to be reasonably

-5-

representative" of the community. 419 U.S. at 538. Because this claim is not cognizable under the Sixth Amendment's fair cross section principle, it was not grounds for a new trial.

## B.

Erickson also argues he was entitled to a new trial in a different venue based on the fact that a disproportionate number of potential Native American jurors were stricken for cause because they either knew Erickson or a government witness, or were familiar with the alleged facts underlying the case. But Erickson agreed to each of the for-cause strikes of Native Americans, at least one of which was based on unrelated medical issues, and he did not contest the non-discriminatory reasons the government offered for its peremptory strikes of the remaining Native Americans on the jury panel. Moreover, Erickson did not seek a change of venue on these grounds at jury selection or at any other time during trial. See United States v. Cordova, 157 F.3d 587, 597 n.3 (8th Cir. 1998).

The district court denied the motion for new trial in a thorough order that addressed "the unique challenges to achieving adequate representation of Native Americans on jury panels in the Central Division." Despite those challenges, the district court described the complete absence of Native Americans on Erickson's jury as an "anomaly," stating that "despite the vast majority of federal criminal cases in the Central Division arising from reservations . . . Central Division petit juries almost always have at least one, not uncommonly two, and occasionally three Native Americans among the twelve who deliberate." And it noted that while potential jurors from the Rosebud Indian Reservation may have had familiarity with Erickson or his case, there were three other reservations from which jurors might have been called for service on Erickson's jury. The district court was aware of and attentive to Erickson's concerns, but ultimately concluded that a new trial in a different venue was not warranted on these grounds. We discern no abuse of discretion in this

carefully explained decision. See United States v. Dowty, 964 F.3d 703, 708 (8th Cir. 2020) (explaining that we review the district court's ruling on a motion for a new trial for "a clear and manifest abuse of discretion") (quoting United States v. Amaya, 731 F.3d 761, 764 (8th Cir. 2013)).

## II.

Next, Erickson asserts there was insufficient evidence for the jury to convict him on the conspiracy count. See 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 846. We review this challenge de novo, examining the evidence "in the light most favorable to the guilty verdict, [and] granting all reasonable inferences that are supported by that evidence." United States v. Sullivan, 714 F.3d 1104, 1107 (8th Cir. 2013) (quoting United States v. Van Nguyen, 602 F.3d 886, 897 (8th Cir. 2010)). The court "will reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. (quoting United States v. Wells, 706 F.3d 908, 914 (8th Cir. 2013)).

To convict Erickson on this count, the jury had to find beyond a reasonable doubt: (1) that there was a conspiracy to distribute 500 grams or more of methamphetamine, (2) that Erickson knew about it, and (3) that he intentionally joined it. See United States v. Holmes, 751 F.3d 846, 852 (8th Cir. 2014). Proving a conspiracy does not require evidence of "an express agreement." United States v. Adams, 401 F.3d 886, 893–94 (8th Cir. 2005). "Rather, the government need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of the defendant's actions." Id. at 894 (cleaned up) (quoting United States v. Cabrera, 116 F.3d 1243, 1245 (8th Cir. 1997)).

The government's main witness at trial was Witness C. Witness C told the jury that she provided Erickson with several pounds of methamphetamine to sell on numerous occasions in 2015, and that he also obtained significant quantities directly

from one of her contacts in Nebraska. Witness C acknowledged "there was no actual I'm going to give you this much and I want this much in return" kind of agreement. But she testified that she "would just show up with the meth" and Erickson "would help [her] sell it." And, rather than requiring immediate payment from Erickson, Witness C said she would often "front" the methamphetamine to him, allowing him to repay her from the proceeds of his own drug sales. This is sufficient to establish a tacit understanding between Erickson and Witness C that they would work together to sell methamphetamine.

It was also Witness C who linked Erickson to more than 500 grams of methamphetamine—the amount required to convict him on this count. See 21 U.S.C. § 841(b)(1)(A)(viii). She told the jury that she took approximately 20 trips from Nebraska to the Rosebud Indian Reservation in 2015 for the purpose of distributing methamphetamine. She generally transported between one and three pounds of methamphetamine at a time and usually gave half of that amount to Erickson to sell. The government's other witnesses painted Erickson as a "small time guy" and described purchasing personal use amounts of methamphetamine from him on several occasions. But Witness C's testimony about the significant drug quantities Erickson received and distributed supported a finding that he conspired to distribute 500 grams or more of methamphetamine.

Erickson takes issue with the government's heavy reliance on Witness C to prove both his participation in the conspiracy and the quantity of methamphetamine he was held responsible for. Although his conviction on this count indeed turned largely on Witness C's testimony, the jury's verdict shows it found her credible. We cannot reweigh the evidence or reexamine the credibility of witnesses to determine whether this was justified—"that is the province of the jury." United States v. White, 794 F.3d 913, 918 (8th Cir. 2015). We find there was sufficient evidence for the jury to find the government proved the elements of the conspiracy count beyond a reasonable doubt.

## III.

Erickson also challenges an evidentiary matter that arose during his trial. At trial, the government called Witness S. Witness S testified that Erickson tried to recruit him to sell methamphetamine and that he purchased small amounts from Erickson on several occasions during the summer of 2015. After Witness S finished testifying, defense counsel told the court that he believed Witness S was under the influence of methamphetamine. Counsel cited to Witness S's slurred speech as well as to information he received from family members, and he asked the court to order Witness S to submit a urine sample for drug testing. The district court responded that it "didn't have the same impression during [Witness S's] testimony," noting that Witness S had spent the previous night in custody, but asked counsel "who, if anyone, would testify" that Witness S had recently used drugs. Counsel was unable to identify anyone.

The district court then granted counsel's request for a short break. When court resumed, defense counsel said he intended to call Witness S back to the stand, and he proposed that he ask Witness S one question: whether he was "willing to take a urinalysis today to prove to this jury that [he wasn't] under the influence while . . . here testifying today." The court granted the request, and Witness S was brought back into the courtroom. When asked this question in front of the jury, Witness S said no.

We see no abuse of discretion in how the district court handled this evidentiary matter. See United States v. White, 557 F.3d 855, 857 (8th Cir. 2009) (stating that evidentiary rulings are reviewed for an abuse of discretion). Erickson challenges the district court's failure to order Witness S to submit a urine sample for testing, but the court did not rule on this request, presumably because counsel proposed an alternative way to present the sought-after information to the jury. The court permitted defense counsel to re-call Witness S and ask him whether he would submit to drug testing.

-9-

That question and Witness S's answer to it gave the jury relevant information—the possibility that he might be under the influence of drugs—to consider when assessing the reliability of his testimony.

And while Erickson now argues it was also error to prohibit him from "fully cross-examining [Witness S] regarding his possible intoxication and methamphetamine use on the [day prior to trial]," defense counsel requested permission to ask only a single question when he re-called Witness S to the stand. In his proposal to the court, counsel said, "whatever the answer [from Witness S] is, the answer is and that would be my only question." Counsel did not seek permission to question Witness S further and the district court did not abuse its discretion by excusing Witness S after he answered the single question posed to him.

IV.

Finally, Erickson contends the district court erred by denying his motion for a new trial on the basis of newly discovered evidence. We review the district court's ruling "for clear abuse of discretion." United States v. Shumaker, 866 F.3d 956, 961 (8th Cir. 2017). To warrant a new trial based on previously unavailable evidence, Erickson must demonstrate the following: "(1) the evidence is in fact newly discovered since trial; (2) diligence on his part [in identifying the evidence]; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) it is probable that the new evidence would produce an acquittal at the new trial." Id. (quoting United States v. Bell, 761 F.3d 900, 911 (8th Cir. 2014)).

Three months after trial, the government turned over to defense counsel audio recordings of law enforcement's May and June 2019 interviews with Witness C. Erickson had received written reports summarizing the interviews prior to trial, but not the recordings. The reports describing the two June 2019 interviews included the

-10-

following disclaimer: "The below is an interview summary. It is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communications by the parties in the interview room were electronically recorded. The recording captures the actual words spoken." The report summarizing the May 2019 interview did not contain a similar disclosure.

Putting aside whether Erickson could, with more diligence on his part, have discovered the audio recordings before trial, previously unavailable evidence must be material to warrant a new trial. Id. at 961. And evidence that merely impeaches is not material. See United States v. Lewis, 976 F.3d 787, 795 (8th Cir. 2020); United States v. Meeks, 742 F.3d 838, 841 (8th Cir. 2014) ("In order to meet the materiality requirement, newly discovered evidence must be more than merely impeaching." (cleaned up) (quoting United States v. Baker, 479 F.3d 574, 577 (8th Cir. 2007))).

The district court reviewed the audio recordings and the written reports in camera and found that any information contained in the recordings that was not included in the reports was neither material to Erickson's defense nor exculpatory. Instead, the court found the recordings and their corresponding written reports were "substantially similar." Although Erickson argues to the contrary, he merely points out inconsistencies between Witness C's trial testimony and her statements to law enforcement as captured on those recordings and asserts that the government's late disclosure of the recordings "prevented [him] from devastating [Witness C's] credibility by a thorough impeachment of it." This is impeachment evidence, and Erickson fails to explain how it is nevertheless material. The district court did not abuse its discretion by denying Erickson's motion for a new trial on the basis of newly discovered evidence.

-11-

## V.

We affirm the judgment of the district court.

_____