# United States Court of Appeals
### For the Eighth Circuit

_____

No. 22-2438

_____

United States of America,

*Plaintiff - Appellee*,

v.

Marcus Andrew Burrage,

*Defendant - Appellant.*

_____

No. 22-2439

_____

United States of America,

*Plaintiff - Appellee*,

v.

Marcus Andrew Burrage,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: March 15, 2023
Filed: August 2, 2023

_____

Before COLLOTON, MELLOY, and GRUENDER, Circuit Judges.
_____

COLLOTON, Circuit Judge.

A jury convicted Marcus Burrage of assaulting a person assisting a federal officer, and a second jury convicted Burrage of drug offenses. On appeal, Burrage raises several challenges to his convictions. We conclude that there is no reversible error, and therefore affirm the judgment of the district court.[*]

I.

In February 2017, Burrage began a term of supervised release after serving a prison term for distributing heroin. By the spring of 2017, Burrage started selling heroin again. From the spring of 2017 through May 2018, Burrage distributed substantial quantities of heroin in central Iowa.

Burrage acquired his heroin in Chicago. He and his associates traveled back and forth between Iowa and Chicago as they replenished their supply. On April 9, 2018, law enforcement officers in Chicago conducted a traffic stop of a vehicle that had been reported stolen. The occupants of the vehicle were Burrage and his girlfriend.

After Burrage refused to exit the vehicle, officers placed Burrage in handcuffs and searched him. The search discovered more than eighteen grams of heroin and six thousand dollars in cash. Officers arrested Burrage and transported him to jail.

_____

[*]The Honorable Stephanie M. Rose, Chief Judge, United States District Court for the Southern District of Iowa.

-2-

Law enforcement officers in Iowa also had been investigating Burrage for drug trafficking. The next day, April 10, 2018, officers executed a search warrant on an apartment in Nevada, Iowa, where Burrage lived with his girlfriend. The search located twenty-one grams of heroin, thirteen grams of marijuana, digital scales, plastic baggies, and other drug-trafficking paraphernalia.

Shortly after officers completed the search in Iowa, Burrage posted bond and was released from custody in Chicago. Burrage learned from his girlfriend about the search of the apartment in Iowa. He absconded and remained at large until authorities arrested him on a warrant for supervised release violations in May 2019. A grand jury charged Burrage with conspiring to distribute heroin during 2017 and 2018, and with possession with intent to distribute heroin on or about April 10, 2018.

While awaiting trial on the heroin charges, Burrage was detained in the Polk County Jail in Des Moines. The jail provided for the secure custody, safekeeping, and care of federal detainees under an intergovernmental agreement with the United States Marshals Service.

A single correctional officer supervised each housing unit in the jail, and a unit typically housed between fifty-five and sixty detainees. Federal and state detainees were commingled, and each correctional officer was responsible for maintaining the safety and security of staff and detainees.

On March, 9, 2021, Correctional Officer Devan Pierce was the officer on duty in Burrage's housing unit. That morning, Pierce removed two detainees for improper behavior at breakfast, and the incident created a tense atmosphere in the unit. After breakfast, Pierce observed a large group of detainees gathering in the unit's television room. He entered to investigate and noticed a detainee with a bloody nose. After trying unsuccessfully to remove the injured detainee, Pierce called in a group known as the utility response team for backup.

While the utility response team assisted with the situation in the television room, Officer Pierce worked to return the remaining detainees to the "bunks" where they slept and kept their personal items. A detainee became belligerent, and Pierce and another officer decided to remove that detainee from the unit. As Pierce attempted to place wrist restraints on the detainee, Burrage struck Pierce in the back of the head, causing an immediate sharp pain. Officers apprehended Burrage and placed him in a holding cell. In the weeks following the attack, Pierce suffered concussion-like symptoms and missed work.

As a result of this incident, a grand jury charged Burrage with assaulting a person assisting an officer or employee of the United States in the performance of official duties. *See* 18 U.S.C. §§ 111, 1114(a). Burrage proceeded to trial first on the assault charge, and a jury found him guilty. In a separate trial on the drug charges, a jury found Burrage guilty on all counts. The district court sentenced him to 375 months' imprisonment.

## II.

On appeal, Burrage first argues that the district court violated his right under the Sixth Amendment to a trial by an impartial jury drawn from a fair cross section of the community. *See Duren v. Missouri*, 439 U.S. 357, 363-64 (1979). Burrage, an African American, complains that the thirty-eight prospective jurors for his first trial included no African Americans, and that the forty-five member venire panel for his second trial included only one African American. He also objects that the 300-member jury pools from which the venire panels were drawn included only six and four African Americans, respectively.

Federal Rule of Criminal Procedure 12(b)(3), formerly Rule 12(b)(2), provides that defects in instituting the prosecution "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined

without a trial on the merits." This rule governs a constitutional claim of discrimination in the selection of a petit jury. *See Davis v. United States*, 411 U.S. 233, 235-38 (1973); *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 362 (1963).

The district court may set a deadline for the parties to make pretrial motions. Fed. R. Crim. P. 12(c)(1). "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). To show good cause, a party must show cause and prejudice. *United States v. Blanks*, 985 F.3d 1070, 1072 (8th Cir. 2021).

In the assault case, Burrage raised his Sixth Amendment fair cross section claim and a related discovery request on the first day of trial, February 17, 2022, after the court and the government examined prospective jurors. This occurred well after the pre-trial motion deadline of September 20, 2021.

In the drug trial, Burrage first made an oral objection to the jury pool at the final pre-trial conference on April 6, 2022, well after the pre-trial motion deadline of March 14, 2022. He eventually requested an expert on April 10, 2022, and filed a discovery request and a motion objecting to the jury venire on the first day of trial, April 11, 2022.

The district court denied Burrage's motions and the related requests as untimely, and concluded that Burrage had failed to show good cause for his delay. Fed. R. Crim. P. 12(c)(1), (3). The court elaborated on its conclusions in later orders denying Burrage's motions for new trials.

Burrage argues that his motions were timely because the grounds were not reasonably available before trial. Alternatively, he maintains that the court abused its discretion in determining that he failed to show good cause to excuse the delay.

-5-

Burrage asserts that he lacked knowledge of the factual and legal bases to challenge the racial composition of the jury pools until he saw the jury venires in the courtroom at his trials.

"The Constitution does not guarantee a defendant a proportionate number of his racial group on the jury panel or the jury which tries him; it merely prohibits deliberate exclusion of an identifiable racial group from the juror selection process." *United States v. Jefferson*, 725 F.3d 829, 835 (8th Cir. 2013) (internal quotation omitted). As the Second Circuit put it, "the Sixth Amendment guarantees the *opportunity* for a representative jury venire, not a representative venire itself." *United States v. Jackman*, 46 F.3d 1240, 1244 (2d Cir. 1995). As such, it is the number of African-Americans in the jury pool, not the number who showed up for jury selection in a particular case, that is relevant to assessing the merits of Burrage's fair cross section challenge. *United States v. Erickson*, 999 F.3d 622, 627 (8th Cir. 2021).

Citing *State v. Lilly*, 930 N.W.2d 293 (Iowa 2019), Burrage argues that he lacked standing to bring a fair cross section challenge until he discovered that the panel of prospective jurors in his cases did not include African Americans. In *Lilly*, however, the defendant brought a fair cross section challenge *before* trial based on the racial composition of the pool of jurors who were summoned to the courthouse for a particular time period. *Id.* at 297-98, 298 n.2. *Lilly* does not support Burrage's contention that he must challenge only the panel of jurors summoned to a particular courtroom, and our precedent says the opposite in any event. *Erickson*, 999 F.3d at 627.

The current jury selection plan for the Southern District of Iowa has been in place since July 7, 2020. The plan requires the clerk of court to maintain records relating to each master wheel, qualified wheel, jury pool, and jury panel. On order of the court, the clerk must make these records available for the purpose of determining the validity of the selection of any jury. The clerk can generate various

reports, including reports showing the racial composition of jury pools. Information on the racial composition of jury pools was thus reasonably available to Burrage, and could have been obtained "in the exercise of due diligence" before the pre-trial motion deadlines in these cases. *See Shotwell*, 371 U.S. at 363.

Burrage complains that the district judge was unaware that the clerk collected data on the race of potential jurors. But whether or not the district judge was familiar with the information gathered by the clerk, the relevant reports were available to Burrage on request. Burrage could have inquired about information on the racial composition of jury pools before the pre-trial motion deadlines. The district court did not abuse its discretion in denying Burrage's motions as untimely.

### III.

Burrage next contends that the evidence is insufficient to support his conviction for assault under 18 U.S.C. §§ 111, 1114(a). The statutes make it a crime to assault "any person assisting" an "officer or employee of the United States or any agency in any branch of the United States Government" in the "performance of [official] duties or on account of that assistance." 18 U.S.C. § 1114. Section 111 applies to state prison guards responsible for housing and supervising federal prisoners under an intergovernmental agreement between a county jail and the United States Marshals Service. *United States v. Luedtke*, 771 F.3d 453, 455 (8th Cir. 2014).

Burrage asserts that Officer Pierce was not assisting an officer of the United States when he was assaulted, because the detainee with a bloody nose and another detainee extracted by the utility response team were *state* detainees. But federal and state detainees were commingled in the Polk County Jail, and the jail provided for the secure custody, safekeeping, and care of federal detainees under an intergovernmental agreement with the Marshals Service. Pierce testified that correctional officers

generally cannot distinguish between state and federal detainees, and that it was his duty to maintain the safety and security of detainees in the jail.

Before the assault, Officer Pierce called in backup to deal with a detainee's medical situation, ordered detainees back to their bunks, and started to restrain a non-cooperative detainee. Pierce testified that his actions were taken for the safety of everyone in the unit. A reasonable jury could have found that Officer Pierce was assisting the United States Marshals Service in its duty to provide for the safekeeping of federal detainees. 18 U.S.C. § 4086; *Luedtke*, 771 F.3d at 455. There was sufficient evidence to support the conviction.

IV.

Burrage next argues that the jury instructions incorrectly set forth the elements of the assault charge. We review the district court's jury instructions for abuse of discretion. *United States v. Williams*, 605 F.3d 556, 567 (8th Cir. 2010). We consider the instructions as a whole to determine whether they fairly and adequately presented the issue to the jury. *United States v. Hayes*, 518 F.3d 989, 994 (8th Cir. 2008).

Burrage complains that the instruction setting forth elements of the offense required the jury to find only that Officer Pierce was "engaged in the performance of his official duties," without reference to a federal function. On that basis, Burrage contends that the jury could have convicted without finding that Pierce was assisting an officer or employee of the United States. The jury instructions, however, defined "engaged in the performance of his official duties," as "providing assistance to the United States Marshals Service in their duty to provide for the care and supervision of federal prisoners in custody at the Polk County Jail." When read as a whole, the instructions required the jury to find that Officer Pierce was assisting the United

States Marshals Service at the time of the assault. There was no abuse of discretion in fashioning the instructions.

## V.

Burrage also maintains that the district court erred in admitting evidence arising from his arrest in Chicago on April 9, 2018. Burrage contends that the evidence was impermissible "character" or "propensity" evidence under Federal Rule of Evidence 404(b) and was unfairly prejudicial under Rule 403. We review the district court's ruling for abuse of discretion. *United States v. O'Dell*, 204 F.3d 829, 833 (8th Cir. 2000).

Burrage was charged with conspiring to distribute heroin from at least the fall of 2017 through May 21, 2018, in the Southern District of Iowa and elsewhere. Witnesses testified that Burrage obtained heroin in Chicago and traveled back and forth between Iowa and Chicago to replenish his supply. The disputed evidence showed that investigators seized more than eighteen grams of heroin and six thousand dollars in cash from Burrage in Chicago during the course of the charged conspiracy in April 2018.

Burrage's possession of heroin in quantities suitable for distribution during the charged conspiracy is direct evidence that he participated in the conspiracy. The evidence is not proof of some "other crime, wrong, or act" that would be governed by Rule 404(b). *O'Dell*, 204 F.3d at 833-34. The large amount of seized cash is likewise probative of Burrage's participation in the charged conspiracy, given that drug trafficking is a cash business. *See United States v. Stephenson*, 924 F.2d 753, 763-64 (8th Cir. 1991).

Under Rule 403, the district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed.

R. Evid. 403. Evidence of drug activity by a conspirator during the conspiracy is relevant evidence of the existence of the conspiracy. *United States v. Brown*, 956 F.2d 782, 786 (8th Cir.1992). The evidence here was prejudicial in the sense that it tended to prove the existence of the conspiracy, but it was not unfairly prejudicial because it was directly relevant to the charged offense. *United States v. Skarda*, 845 F.3d 370, 378 (8th Cir. 2016). The district court did not abuse its discretion in admitting the evidence.

\* \* \*

The judgment of the district court is affirmed.

_____